**McGuireWoods LLP**
Michael D. Mandel (SBN 216934)
mmandel@mcguirewoods.com
John A. Van Hook (SBN 205067)
jvanhook@mcguirewoods.com
Lindsay L. Ryan (SBN 258130)
lryan@mcguirewoods.com
Ashley R. Li (SBN 317305)
ali@mcguirewoods.com
1800 Century Park East, 7th Fl.
Los Angeles, CA 90067-1501
Telephone: (310) 315-8200
Facsimile:  (310) 315-8210

Sylvia J. Kim (SBN 258363)
Email:  skim@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111
Telephone:  415.844.9944
Facsimile:  415.844.9922

Attorneys for Defendant
BANK OF AMERICA, N.A.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA LOPEZ, SAMUEL WILLIS, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION and DOES 1 through 10, inclusive,<br><br>   Defendants. | Case No. 18-cv-02346-VC<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>***Filed Concurrently Herewith*:**<br>&bull; **DECLARATION OF JOHN A. VAN HOOK**<br>&bull; **DECLARATION OF ASHLEY LI**<br>&bull; **DECLARATION OF BARRY DONNELLY**<br>&bull; **DECLARATION OF VINCENT SCARPELLINO**<br>&bull; **DECLARATIONS OF PUTATIVE CLASS MEMBERS**<br>&bull; **APPENDIX OF EVIDENCE**<br><br>Date: June 19, 2019<br>Time: 10:00 a.m.<br>Courtroom: 2<br>Judge: Vince Chhabria |

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.    BANK OF AMERICA'S SMALL BUSINESS LINE OF BUSINESS. .................................. 3

    B.    SMALL BUSINESS BANKERS ................................................................................ 4

    C.    SBBS HAVE DISCRETION TO MANAGE THEIR OWN TIME AND SALES
           ACTIVITIES. .......................................................................................................... 5

    D.    ALTHOUGH SBBS ARE EXPECTED TO SPEND THE MAJORITY OF THEIR TIME
           ON OUTSIDE SALES ACTIVITIES, THE AMOUNT OF TIME SPENT OUT IN THE
           SALES TERRITORY VARIES. ................................................................................... 5

    E.    PLAINTIFFS WERE COUNSELED FOR THEIR FAILURE TO MEET
           EXPECTATIONS FOR THEIR SALES PERFORMANCE AND INSUFFICIENT FACE-
           TO-FACE MEETINGS. ............................................................................................ 8

    F.    SBBS USE SALESFORCE TO RECORD CERTAIN ACTIVITIES, BUT THE
           SALESFORCE DATA DOES NOT REFLECT THE AMOUNT OF TIME SPENT ON
           OUTSIDE SALES ACTIVITIES.................................................................................. 9

    G.    THE SALESFORCE DATA FOR THE PUTATIVE CLASS MEMBERS REFLECTS
           WIDELY VARYING LEVELS OF FACE-TO-FACE MEETINGS. ..................................... 10

    H.    SBBS MAY REQUEST REIMBURSEMENT FOR MILEAGE AND OTHER
           BUSINESS EXPENSES, BUT THEIR EXPENSE REPORTS ARE NOT COMPLETE
           OR ACCURATE RECORDS OF OUTSIDE SALES ACTIVITIES.................................... 10

III.  PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIREMENTS
      UNDER RULE 23 FOR CLASS CERTIFICATION ....................................... 12

    A.    THE OUTSIDE SALESPERSON EXEMPTION .......................................................... 12

    B.    PLAINTIFFS HAVE ESTABLISHED NEITHER COMMONALITY NOR
           PREDOMINANCE. ................................................................................................ 13

           1.    Plaintiffs Have Not Met The Commonality Requirement. ...................... 13

           2.    Individual Issues Predominate Concerning the Amount of Time
                 Each SBB Spends On Outside Sales Duties. .......................................... 14

                 a.    There Is No Uniform Policy Or Practice That Can Decide
                       Liability................................................................................... 14

                 b.    SBBs' Outside Activities Can Only Be Established
                       Through Individualized Evidence................................................. 16

                 c.    The Evidence Shows Extreme Variance In SBBs'
                       Estimates Of Their Time Outside. ............................................... 17

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

|  | 3. | The Bank's Reasonable Expectations, And Expressions Of Displeasure With SBBs' Performance, Require Individualized Proof And Analysis. | 19 |
|  | 4. | Plaintiffs Cannot Establish That The Exemption Determination Would Be The Same For The Entire Class. | 19 |
| C. | | PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE SBBs. | 20 |
| D. | | PLAINTIFFS HAVE NOT ESTABLISHED THAT THE CLASS DEVICE OFFERS A SUPERIOR MEANS OF RESOLVING THESE CLAIMS. | 21 |
| E. | | PLAINTIFFS HAVE PROVIDED NO MANAGEABLE TRIAL PLAN | 22 |
| IV. | | CONCLUSION | 23 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)...............................................................................................21

*Casey v. Home Depot*,
   2016 U.S. Dist. LEXIS 192441 (C.D. Cal. Sept. 15, 2016).....................................17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)....................................................................................................22

*Deane v. Fastenal Co.*,
   2012 U.S. Dist. LEXIS 191570 (N.D. Cal. Sept. 26, 2012) ....................................18

*Fjeld v. Penske Logistics, LLC*,
   2013 U.S. Dist. LEXIS 116485 (C.D. Cal. 2013)....................................................14

*Hanson v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...................................................................................20

*Mevorah v. Wells Fargo Home Mortg.*,
   571 F.3d 953 (9th Cir. 2009) ...............................................................14, 15, 16, 19

*Moriskey v. Pub. Serv. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.NJ. 2000) ..........................................................................20

*Pablo v. ServiceMaster Global Holdings, Inc.*,
   2009 U.S. Dist. LEXIS 79584 (N.D. Cal. Aug. 17, 2009).......................................18

*In re Paxil Litig.*,
   212 F.R.D. 539 (C.D. Cal. 2003)..............................................................................22

*Rosenberg v. Renal Advantage, Inc.*,
   2013 U.S. Dist. LEXIS 88468 (S.D. Cal. 2013) ......................................................14

*Spainhower v. U.S. Bank Nat'l Ass'n*,
   2010 U.S. Dist. LEXIS 46316 (C.D. Cal. Mar. 25, 2010).......................................17

*Trahan v. U.S. Bank N.A.*,
   2015 U.S. Dist. LEXIS 1144 (N.D. Cal. Jan. 6, 2015) .......................................17, 22

*Villa v. United Site Servs. of Cal., Inc.*,
   2012 U.S. Dist. LEXIS 162922 (N.D. Cal. 2012) ...................................................22

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

*Vinole v. Countrywide*,
    571 F.3d 935 (9th Cir. 2009) ...............................................................15, 16, 17, 18, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................13, 20, 22

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
    268 F.R.D. 604 (N.D. Cal. 2010).........................................................................14, 15, 17, 22

*Zinser v. Accufix Research*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................................22

**State Cases**

*Dailey v. Sears, Roebuck & Co.*,
    214 Cal. App. 4th 974 (2013) ................................................................................19

*Duran v. U.S. Bank National Assn.*,
    59 Cal. 4th 1 (2014) ...........................................................13, 14, 15, 16, 19, 20, 22

*Heyen v. Safeway Inc*.
    216 Cal. App. 4th 795 (2013) ................................................................................19

*Ramirez v. Yosemite Water Co.*,
    20 Cal.4th 785 (1999) ......................................................................................16, 19

*Sav-On v. Super. Ct.*,
    34 Cal. 4th 319 (2004) ............................................................................................15

*Soderstedt v. CBIZ Southern California, LLC*,
    197 Cal. App. 4th 133 (2011) ................................................................................16

*Walsh v. Ikon Office Solutions*,
    148 Cal. App. 4th 1440 (2007) ..............................................................................18

**State Statutes**

Labor Code § 1171.................................................................................................12

**Rules**

Federal Rule of Civil Procedure 23 ..........................................................1, 12, 14, 24

Federal Rule of Civil Procedure 23(a)(3) .......................................................................20

Federal Rule of Civil Procedure 30(b)(6) ........................................................................8

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

**Regulations**

IWC Wage Order 4-2001, §§ 1(C), 2(M) ........................................................................12

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Defendant Bank of America, N.A. ("Defendant" or "the Bank") hereby submits its Opposition to Plaintiffs' Motion for Class Certification.

## I.   INTRODUCTION

Plaintiffs' Motion for Class Certification (the "Motion") should be denied because Plaintiffs have not, and cannot, establish the requirements for certification under Federal Rule of Civil Procedure 23 ("Rule 23").  The insurmountable obstacle to certification in this case is the fact that the central question – whether each putative class member satisfied the outside salesperson exemption – is not a question that can be resolved on a class-wide basis through common proof.

The most important aspect of the outside salesperson analysis is whether each California Small Business Banker ("SBB") actually spends more than half of his or her working time on outside sales activities.  Although there apparently is no dispute by Plaintiffs as to the *sales* nature of the SBB position, Plaintiffs do challenge whether the SBBs' sales duties occurred *outside*.  This necessarily requires individual evidence and analysis into how each SBB spent his or her workday. The evidence confirms the need for this individualized determination.  The evidence reflects that SBBs spend widely varying percentages of their working time outside in their sales territory.  For example, in the surveys *gathered by Plaintiffs*, SBBs reported that they spent, on average between ***10% and 80%*** of their time outside in their territory, with the remaining working time spent inside the Bank's offices or branches, which are known as financial centers.  According to these surveys, at least 17 SBBs reported to Plaintiffs that they spent at least 50% or more of their working time outside of the Bank's facilities.  These responses, on their face, are an acknowledgment that those SBBs satisfy the outside sales exemption.  In addition, Defendant has produced additional declaration testimony from SBBs reflecting that they typically spend the majority of their time on outside sales activities, although that percentage varies from person to person.   Accordingly, the evidence compels the conclusions that:  (1) time spent outside in the territory varies substantially from SBB to SBB, and (2) a significant portion of the SBBs acknowledge that they spend most of their time on outside sales.  This alone should demonstrate that class certification is inappropriate.

The Bank's expectations for outside sales activities also do not permit class certification.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

It is apparent that SBBs had different understandings regarding the Bank's expectations for time spent outside.  Likewise, while some SBBs – including both Plaintiffs – were counseled for their inadequate sales performance, to evaluate the merits of their claims it would be necessary to determine whether each SBB was counseled for their level of *outside* sales activities.

Plaintiffs erroneously assert that data sources can establish whether each SBB spent most of his or her time on outside sales.  First, contrary to their contention, the Bank's SalesForce system, which SBBs use to track various sales activities, is incapable of establishing the amount of time that a SBB spends on outside sales.  Although SBBs are expected to record each "face-to-face" meeting in the SalesForce system, the SalesForce system does not generally indicate the exact physical location of the meeting took place, how long it lasted, how long it took to travel for the meeting, or preparation time for the meeting.  The record of "face-to-face" meetings in SalesForce also does not include time spent by SBBs attending business development and networking functions – tasks that are clearly related to developing clients.  Moreover, Plaintiffs themselves cannot even agree on what is a "face-to-face" meeting, as Plaintiff Laura Lopez testified that "face-to-face" means an *in-person* meeting, while Plaintiff Samuel Willis testified that *telephone calls* could be counted as "face-to-face" meetings.

Second, SBBs' expense reports cannot establish, or even provide accurate evidence of, SBBs' outside sales activities.  Lopez testified that she *never* submitted her work-related mileage for reimbursement.   Willis testified that he *sometimes* submitted his mileage expenses for reimbursement, but there was no rhyme or reason for when he decided to submit his mileage. Many other SBBs likewise confirmed that they did not seek reimbursement for all of their business mileage, particularly for trips of a limited distance.  Accordingly, these records which SBBs create are not only incomplete, there is no conceivable way to determine the extent to which employees under-reported their mileage.[1]

---

[1] Plaintiffs' decision not to seek class certification of their expense reimbursement claim is a further acknowledgement of the highly individualized nature of SBBs' practices in seeking mileage reimbursement.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Plaintiffs also point to various decisions, policies and procedures to argue that common issues predominate, but this argument also fails. Although SBBs are commonly classified as exempt, are subject to the same compensation system, and receive the same general training and guidelines, none of those materials dictate a specific percentage of time spent outside. Although many SBBs understand that success in the SBB role requires spending most of their working time out in their sales territory, other SBBs (like Plaintiffs) have a different view of their role. Courts in the Ninth Circuit consistently explain that common decisions and policies do not justify class certification if they are not capable of answering the liability question. That is precisely the case here, particularly where many of the SBBs surveyed by Plaintiffs have confirmed they spent most of their working time on outside sales – the key inquiry in the outside sales exemption.

The adjudication of whether each SBB satisfied the outside salesperson exemption would require a mini-trial for each person, examining their sales activity data, but also testimony from the SBB, his or her manager, financial center employees they allegedly worked alongside, among many other forms of evidence. As a result, Plaintiffs cannot establish commonality, predominance, typicality or superiority, and class certification should be denied in its entirety.[2]

## II.   STATEMENT OF FACTS

### A.   Bank of America's Small Business Line of Business.

Bank of America's Small Business Banking line of business provides financial products and services to small businesses clients, which typically means business with revenue between

---

[2] Plaintiffs seek to certify only their overtime claims (their First and Second Causes of Action). Plaintiffs' operative Second Amended Complaint also asserts putative class claims for alleged meal and rest period violations (Third and Fourth Causes of Action), alleged unreimbursed business expenses (Fifth Cause of Action), and alleged wage statement violations (Sixth Cause of Action). Given the court's deadline for Plaintiffs to move for class certification, the class allegations in the Third through Sixth Causes of Action should be dismissed and/or stricken. To the extent Plaintiffs are subsequently permitted to seek certification of any of their other claims, Defendant reserves all arguments against the certification of such claims.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

$250,000 and $5 million.  Declaration of Ashley R. Li (hereinafter "Li Decl."), ¶ 2, Exh. 1, Amaral Depo. at 112:4-15.[3]

To sell those products and services to small business clients, the Bank employs inside sales employees – Small Business Consultants ("SBCs") – who work out of the Bank's branches (also referred to as "banking centers" or "financial centers").  *See* Declaration of Vincent Scarpellino ("Scarpellino Decl."), ¶ 3.  SBCs perform their duties at their designated financial center(s).  They engage with clients that come to the financial centers and by phone.  *See id.*  At all relevant times, the Bank has classified SBCs as *non-exempt* employees.  *See id.* ¶ 4.

The Small Business line of business also employs outside sales employees – SBBs – the position at issue in this case.  In contrast to the SBCs, who are *non-exempt, inside sales* employees, SBBs are exempt, outside sales employees.  SBBs are expected to primarily work out in their territory, meeting existing and potential clients at their places of business and other outside events, such as networking and community events.[4]  Li Decl., ¶ 2, Exh. 1, Amaral Depo. 30:1-3, 55:5-22.

## B.    Small Business Bankers

In contrast to the SBCs, who work inside of the financial centers, the SBBs have a geographic territory and are expected to conduct their sales by working in that territory, meeting clients and potential clients at their places of business, and developing clients through networking and community events.

The SBB job description provides: "The SBB is responsible for growing the profitability of the small business customer base and will lead with a primary deposit relationship. The SBB is accountable for prospecting and acquiring new priority small businesses, as well as retaining and

---

[3] This dollar range has varied during the relevant time period.

[4] Declaration of Wilber Cabrera ("Cabrera Decl."), ¶ 6 (attends 2 to 3 outside networking events per month, at least 3 hours each); Declaration of Ramona Bostani ("Bostani Decl."), ¶ 6. Lopez, for example, testified that she attended networking events to meet clients typically "once a week," and she would attend these events for roughly two hours up to "a whole day."  Li Decl. ¶ 3, Exh. 2, 71:1-73:12.  Willis testified that that he attended these types of networking events "once a week maybe."  Li Decl., ¶ 4, Exh. 3 at 52:8-15; *see also* Li Decl., ¶ 2, Exh. 1 at 44:2-11.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

deepening existing relationships. …The SBB will be expected to: prospect, cold call, network and develop new business opportunities within the small business banking community, within a specific territory."  Li Decl., ¶ 5, Exh. 4.

The job description also makes clear that SBBs are expected to spend most of their time outside in the territory:  "A significant portion of the SBB's time will be dedicated towards new acquisition activities and ***the SBB will spend 50% - 80% of their time outside of the banking center***." *Id.* (emph. added).

Consistent with their outside sales role, Defendant treats SBBs as exempt from overtime as outside salespersons, and pays them a salary plus incentives based on their sales performance. Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 64:23-25, 65:3-21.

### C. SBBs Have Discretion to Manage Their Own Time and Sales Activities.

SBBs typically work remotely from their supervisors.  They are not required to be in the office at specific times or on certain days, except for a weekly team meeting.  SBBs typically schedule their own calls, meeting and other sales activities.  Bostani Decl, ¶ 12; Cabrera Decl., ¶ 12; Declaration of Gregory Jewett ("Jewett Decl."), ¶ 11; Declaration of John Moon ("Moon Decl."), ¶ 11; Declaration of Luis Navarro ("Navarro Decl."), ¶ 11.

### D. Although SBBs Are Expected to Spend The Majority Of Their Time On Outside Sales Activities, the Amount of Time Spent Out In The Sales Territory Varies.

The Bank expects SBBs to spend the majority of their time outside of the financial centers or office, and in the sales territory, engaged in sales activities.  SBBs acknowledge that being outside in the territory, meeting business owners face-to-face is the most effective way to conduct sales and to develop relationships with those businesses.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 96:20-97:2, 97:8-98:14; Bostani Decl, ¶ 5; Cabrera Decl., ¶ 5;  Jewett Decl., ¶ 5; Moon Decl., ¶ 5; Navarro Decl., ¶ 5.  Even one of Plaintiffs' own declarants confirmed that Bank expected them to

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

spend most of their time outside: "It was BofA's expectation that I spent the majority of my time outside…" Li Decl, ¶ 6; Exh. 5 at ¶ 11.[5]

Because SBBs have discretion to schedule their own activities and allocate their time, the amount of time they actually spend working outside in the territory varies significantly among the SBBs. For example, the duration of each meeting, and the travel time related to each meeting, can vary significantly. *See* Bostani Decl, ¶ 6; Cabrera Decl., ¶¶ 7-8; Jewett Decl., ¶¶ 6-7; Moon Decl., ¶ 6.

Plaintiffs' own evidence confirms that the time that SBBs spend (or at least claim they spend) on outside sales activities varies substantially. Plaintiffs produced survey results that they obtained from SBBs.[6] Included in the surveys *gathered by Plaintiffs* are responses by:

- Valerie Sheibels: estimating that she spent 90% of her working time outside, going "door to door" to bring in business and conducting "appoints at customers' office." Li Decl., ¶ 7, Exh. 6 at LOPEZ 949-950.

- Brian Grant: 55% of working time outside. *Id.* at 951-952.

- Jon Eric Coler-Dark: 75% of working time outside. *Id.* at 972-973.

- Eduardo Ruiz: 60% of working time outside. *Id.* at 982-983.

- Hanri Yadgari: 50-60% of working time outside. *Id.* at 987-989.

- Sina Sartipi: 70% of working time outside. *Id.* at 994-995.

- Shirley Wong: 80% of working time outside. *Id.* at 996-997.

- Jenene Debow: 76% of working time outside. *Id.* at 1000-1001.

- Richard Hercoson: 75% of working time outside. *Id.* at 1024-1025.

---

[5] In other declarations gathered by Plaintiffs, SBBs stated the opposite. *See, e.g.*, Dkt. #58-24, Ahadi Decl., ¶ 11 ("It was BofA's expectation that I spent the majority of my time working inside the branch location…"); Dkt. #58-25, Corrella Decl., ¶ 11 (same); Dkt. #58-26, Duong Decl., ¶ 11 (same). That Plaintiffs' own declarants have contradictory beliefs as to the Bank's expectations for outside sales, further demonstrates the individualized nature of this issue.

[6] Plaintiffs conducted this survey unilaterally. Defendant does not concede that Plaintiffs' survey itself or any of Plaintiffs' survey methodology was statistically valid.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

According to Plaintiffs' same survey evidence, many other SBBs estimated exactly 50% of their working time was spent outside.  *See, e.g.*, Li Decl., ¶ 7, Exh. 6 at LOPEZ 1010-1011 (Antonio Aylion), 1038-1039 (Jeremy Benson), 1040 (Sean Balkman), 1070 (Joanna Herominek), 1080 (Gregory Karaguezian), 1083 (Adam Kheder), 1086 (Scott Lees), 1104 (Gina Thomas).  In short, all of these SBBs (all of whom Plaintiffs chose to survey) reported spending at least 50%, *and up to 80%*, of their working time outside in the field.  Moreover, these survey results do not appear to include time spent preparing for sales meetings or other tasks necessary for their outside sales activities.

Additional declaration testimony filed with this Opposition further reflects (1) the variance from SBB to SBB in estimated outside time, and (2) that many SBBs report spending the majority of their working time outside.  *See* Cabrera Decl., ¶ 8 (60-70% time outside); Jewett Decl., ¶ 7 (70% of time outside); Bostani Decl, ¶ 8 (50-60% of time outside); Moon Decl., ¶ 11 (50-80% time outside); Navarro Decl., ¶ 7 ("a little over half of my working time outside in my territory").

Not surprisingly, Plaintiffs reported spending most of their time inside.  Lopez testified that she spent the vast majority of her time working either from a Bank office or financial centers.  She testified that even her face-to-meetings were conducted mostly within the financial centers.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 112:2-11, 116:13-117:23 (estimating she conducted 75% to 90% of her client meetings at financial centers).  And other SBBs that responded to Plaintiffs' survey claimed working a high percentage of their working time inside the Bank offices or financial centers.  Some SBBs estimated they spent as much as 85%-90% of their working time inside.  *See* Li Decl., ¶ 7, Exh. 6 at LOPEZ 976-977 (Zorak Abraham), 1015-1016 (Chan Siu).

There is also substantial variance in the testimony of SBBs regarding the duties they performed within financial centers.  For example, Lopez testified that she generally spent an entire day each week at each of her 3-5 financial centers.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at. 83:10-23, 123:3-124:9.  But other SBBs describe a different work routine with respect to their time within financial centers:

- Bostani Decl, ¶ 5 (time spent weekly at each of her four financial centers ranges from

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

1 to 5 hours);

- Jewett Decl., ¶ 8 (spends two hours per week at each of his four financial centers);

- Cabrera Decl., ¶ 9 (spends one entire day per week at his "main" financial center and a couple of hours per week at his two other financial centers);

- Navarro Decl., ¶ 8 (spends two to four hours per week at each of his financial centers).

*See also* Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 49:21-50:12, 51:3-6 (the Bank's expectation is that the SBBs' weekly visits to their financial centers would last approximately one hour).

The Bank's Rule 30(b)(6) witness, who manages SBBs, testified that managers typically do not give SBBs explicit instructions about the percentage of their time they need to spend outside, but they do give them instructions about their face-to-face meetings, which results in time outside.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 106:16-107:16.  SBBs understand that success in their role, and meeting their expectations for face-to-face meetings, requires them to spend the majority of their working time outside.  Cabrera Decl., ¶ 10; Jewett Decl., ¶ 9; Bostani Decl, ¶ 10; Moon Decl., ¶ 9; Navarro Decl., ¶ 9.

### E.    Plaintiffs Were Counseled For Their Failure To Meet Expectations For Their Sales Performance and Insufficient Face-to-Face Meetings.

Not only are face-to-face interactions with customers the most effective way to make sales, these in-person interactions also are the best way to get to know business owners, to deepen relationships, and help understand their future needs for financial services, both on a business and personal level.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 59:3-9.  Both Lopez and Willis were counseled for failing to meet the expectations of SBBs, including as to their face-to-face meetings. Li Decl., ¶ 3, Exh. 2, Lopez Depo. at. 152:20-154:6, LOPEZ 781-784; Li Decl., ¶ 4, Exh. 3, Willis Depp. at 145:1-147:24, BANA 318-319, BANA 273.  SBBs have been counseled and terminated for their sales performance, including their inadequate face-to-face activities.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 25:3-26:3. Other SBBs have been counseled for insufficient outside sales activities, even if they were otherwise meeting their sales production goals.  *Id.* at 170:1-8.

F.   **SBBs Use SalesForce To Record Certain Activities, But The SalesForce Data Does Not Reflect the Amount of Time Spent on Outside Sales Activities.**

Plaintiffs rely heavily on the SalesForce data, but, while the SalesForce data reflects the date and number of calls and face-to-face meetings that the SBBs logged, the data does not reflect:

- The amount of time that a face-to-face meeting or call lasted;

- When that meeting started or ended;

- The travel time associated with a face-to-face meeting; or

- The location of a face-to-face meeting.[7]

Declaration of Barry Donnelly ("Donnelly Decl."), ¶ 3.

In addition, the face-to-face meetings recorded in the SalesForce system likely would not reflect outside activities such as attendance at networking or community events.  For example, Lopez testified that when she attended fairs for work purposes, Chamber of Commerce events, or other business development/networking events, she would not record them as face-to-meetings in SalesForce.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 227:1-25.

Further, although a sales meeting generally should be reflected in the SalesForce system, many other in-person interactions with clients would not be.  Lopez testified that for each sale, she might have five to six meetings with the client to collect documents and information necessary for the sale.  *Id.* at 158:20-159:17.  Lopez testified, however, that she would not log any of these meetings as face-to-face meetings in the SalesForce system.  *Id.* at 159:23-160:7.  As a result, Lopez herself admits that many of her sales-related meetings would not be logged in SalesForce as face-to-face meetings, and perhaps not be logged at all.[8]

---

[7] Throughout most of the relevant time period, the SalesForce system did not have a field in which a SBB could designate whether a face-to-face meeting was conducted at a financial center.  Since approximately January 2018, the SalesForce system has permitted this information to be inputted, but it still depends on SBBs recording this information.  *See* Donnelly Decl., ¶ 4.

[8] The Outlook calendar entries of SBBs would be of limited help in demonstrating SBBs' day-to-day duties.  Li Decl., ¶ 4, Exh. 3 at. 25:20-24, 26:16-20 (approximately half of his sales meetings would be shown on his Outlook calendar, and his Outlook calendar would not reflect whether a meeting was to occur inside or outside of a financial center); Li Decl., ¶ 3, Exh. 2 at

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

The Bank expects "face-to-face" meetings to be just that – in-person meetings with existing or potential clients.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 29:14-16.   However, Plaintiffs themselves have differing views on what a "face-to-face" meeting means.  Lopez confirmed that "face-to-face" means an in-person meeting.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 151:3-8.  Willis, however, claims that he was told that a "telephone meeting" could count as a "face-to-face" meeting.  Li Decl., ¶ 4, Exh. 3, Willis Depo. at 115:22-24.

### G.     The SalesForce Data For The Putative Class Members Reflects Widely Varying Levels of Face-to-Face Meetings.

Defendant produced SalesForce data for the entire putative class, reflecting the face-to-face meetings logged by each SBB on each day.   The median number of weekly face-to-face meetings recorded by SBBs was as high as 15 per week, with approximately 74 SBBs reflecting a median number of at least 10 face-to-face meetings per week.  *See* Van Hook Decl., ¶¶ 3-5.  While the number of face-to-face meetings provides only one clue to the amount or percentage of time spent on outside sales activities, that number varies greatly from employee to employee, and week to week.

### H.     SBBs May Request Reimbursement for Mileage and Other Business Expenses, But Their Expense Reports Are Not Complete Or Accurate Records of Outside Sales Activities.

Although Plaintiffs argue in their Motion that the SBBs' expense reports indicate minimal business mileage by SBBs, their own testimony confirms that these records provide a very incomplete and inaccurate view of SBBs' outside sales activities.  Lopez and Willis admitted that not all of their face-to-face meetings incurred any mileage, testifying that they would walk to some of their meetings with clients.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 212:19-213:13; Li Decl., ¶ 4, Exh. 3, Willis Depo. at 49:18-22.  Willis also testified that sometimes he went to client meetings with other employees and they drove, so he incurred no mileage for those meetings.  Li Decl., ¶ 4, Exh. 3, Willis Depo. at 49:23-50:7.

---

172:4-20 (Outlook calendar set a week or even a month ahead of time and was not updated to reflect actual the activities actually performed).

As for the business mileage that Plaintiffs did incur, Lopez testified that she never submitted her business mileage or other travel expenses for reimbursement:

> "Q:  So if you did drive and incurred mileage expenses or incurred toll expenses in
>
>       doing your duties for Bank of America, they wouldn't be reflected on your
>
>       expense reports; is that right?
>
> A:  That's correct."

Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 136:6-10.  Lopez also testified that she believes the other SBBs on her team likewise did not seek reimbursement for their mileage or other travel expenses, due to alleged instructions from her manager.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 136:11-137:10. Therefore, based on Lopez's own testimony, the expense reimbursements prepared by Plaintiffs themselves do not accurately capture their outside sales activities.

Willis acknowledged that no one ever instructed him not to seek reimbursement, but he testified that his expense reports reflected only a portion of his mileage. "I definitely didn't record every mile and didn't request – request expenses for every mile that I drove on my car whether it was to an appointment.  I sometimes put them; I sometimes didn't."  Li Decl., ¶ 4, Exh. 3, Willis Depo. at 40:15-19.  Willis offered no reason why he would request some mileage expenses but not others: "It was pretty random.  Sometimes I would."  Li Decl., ¶ 4, Exh. 3, Willis Depo. at 40:20-23.

To the extent SBBs were performing business-related travel, but not submitting their expenses for reimbursement to the Bank, other records of their business expenses would be relevant.  For that reason, both Plaintiffs were asked in their depositions whether they had claimed tax deductions for unreimbursed business expenses while SBBs.  Plaintiffs' counsel, however, obstructed discovery into this potential record of Plaintiffs' business mileage.  Based on their counsel's instructions, both Plaintiffs refused to answer any questions relating to their business expense deductions.  Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 141:13-142:6; Li Decl., ¶ 4, Exh. 3,

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Willis Depo. at 47:22-48:9.[9]   Records maintained by SBBs regarding their mileage expense deductions not only are relevant, but clearly *individualized* evidence regarding their outside activities.

Obviously, the mileage reports prepared and submitted by SBBs only identify the travel *for which they seek reimbursement*.   Other SBBs testified that, while they knew they could seek reimbursement for their business-related mileage, they did not seek reimbursement for trips that were short mileage.   Cabrera Decl., ¶ 11 (may not seek reimbursement for short mileage, has deducted mileage on his taxes); Jewett Decl., ¶ 10 (may not submit trip with short mileage); Navarro Decl., ¶ 10 (does not typically seek mileage reimbursement for short trips because "I do not find it worth it"); Moon Decl. ¶ 10 (whether he submits his mileage depends on length of trip and whether it is from his home); Bostani Decl, ¶ 11 (does not typically submit her mileage for reimbursement).   It, therefore, is readily apparent that mileage logs have limited value in describing a SBB's outside sales activities.

Moreover, the mileage reports do not record the amount of time spent at customer visits, or even the time spent traveling to and from a client meeting.   They would record only the number of miles driven.   Thus, the expense reports are not records on which any determination could be made regarding outside sales activities – much less a class-wide determination.

## III.   PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIREMENTS UNDER RULE 23 FOR CLASS CERTIFICATION

### A.   The Outside Salesperson Exemption

California's outside sales exemption applies to employees "who customarily and regularly work[] more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services, or use of facilities."   IWC Wage Order 4-2001, §§ 1(C), 2(M); Labor Code §1171.   In analyzing the outside

---

[9] Defendant has begun to meet and confer with Plaintiffs regarding their refusal to answer any questions about their business expense deductions, but Plaintiffs have not yet agreed to provide further testimony.

sales exemption, "[t]he trial court must inquire 'first and foremost, how the employee *actually* spends his or her time.'" *Duran v. U.S. Bank National Assn.*, 59 Cal. 4th 1, 26 (2014) ("*Duran*") (citing *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 802 (1999) ("*Ramirez*") (emphasis in orig.). Questions of "whether the employee's practice diverges from the employer's realistic expectations" are ancillary. *Duran*, 59 Cal. 4th at 26. The exemption "requires scrutiny of both the job description and an employee's own work habits." *Id.*  Thus, "litigation of the outside salesperson exemption has the obvious potential to generate individual issues because the primary considerations are how and where the employee actually spends his or her workday." *Id*. at 27. Simply put, "[g]iven California's uniquely quantitative approach to [the outside sales] exemption, some proof about how individual employees use their time will often be necessary to accurately determine an employer's overtime liability." *Id.*  Here, of course, this inquiry must be conducted SBB-by-SBB.

### B.    Plaintiffs Have Established Neither Commonality Nor Predominance.

#### 1.    Plaintiffs Have Not Met The Commonality Requirement.

It is not enough for Plaintiffs to merely identify common questions.  As the Supreme Court observed, "[a]ny competently crafted class complaint literally raises common 'question.' … Reciting these questions is not sufficient to obtain class certification.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("*Dukes*").  The commonality requirement means their "claims must depend upon a common contention…That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Id*. at 350 (emphasis added).  Class-wide adjudication must have the ability to "generate common answers apt to drive the resolution of the litigation." *Id.* (internal quotations and citations omitted).

Here, the record shows that there is no common question that can resolve liability as to all SBBs.  Evidence that certain SBBs performed their duties in a manner consistent with, or contrary to, the outside sales exemption cannot establish or defeat the exemption as to other SBBs.  The evidence here shows such a wide disparity in how SBBs claim to perform their jobs that it is

impossible to meaningfully extrapolate any one SBB's experience to any other SBB.  This precludes a finding of commonality.  *See, e.g., Rosenberg v. Renal Advantage, Inc*., 2013 U.S. Dist. LEXIS 88468, *21 (S.D. Cal. 2013) (finding insufficient commonality because "the record shows differing evidence as to how the [employees] actually spend their time on the job," and "variations in how the [employees] performed their duties [and] managed their tasks"); *Fjeld v. Penske Logistics, LLC*, 2013 U.S. Dist. LEXIS 116485, *15 (C.D. Cal. 2013) (commonality not satisfied because the differences in how the plaintiff and other employees performed their duties "would have a significant impact on the exemption analysis.").

### 2.    Individual Issues Predominate Concerning the Amount of Time Each SBB Spends On Outside Sales Duties.

Even if Plaintiffs could establish the commonality prong of Rule 23, Plaintiffs must also establish that common issues predominate over individual issues.  Plaintiffs plainly have not, and cannot, satisfy this requirement.  "[W]hen an employer asserts an exemption as a defense, such as the outside sales exemption, the resolution of which depends upon how employees spend their time at work, unless plaintiff proposes some form of common proof, such as a standard policy governing how and where employees perform their jobs, common issues of law or fact are unlikely to predominate."  *In re Wells Fargo Home Mortg. Overtime Pay Litig*., 268 F.R.D. 604, 611 (N.D. Cal. 2010) ("*In re Wells Fargo*").  In fact, as the Ninth Circuit has recognized, "[o]ften, [the outside sales] exemption will militate against certification because . . . it requires a fact-intensive inquiry into each potential plaintiff's employment situation."  *Mevorah v. Wells Fargo Home Mortg.*, 571 F.3d 953, 959 (9th Cir. 2009) ("*Mevorah*").

### a.  There Is No Uniform Policy Or Practice That Can Decide Liability

At least "some proof about how individual employees use their time will often be necessary to accurately determine an employer's overtime liability" because "the question is 'first and foremost' how the employee's time is actually spent.'" *Duran,* 59 Cal. 4th at 27 (quoting *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 802 (1999)).  "Unless an employer's uniform policy or consistent practice violates wage and hour laws, California courts have been reluctant to certify

class actions alleging misclassification." *Duran*, 59 Cal.4th at 30-31.  The reason for this reluctance is simple:  misclassification cases under California law typically hinge on exemption defenses that demand individual inquiries about employees' actual activities – unless class-wide policies or practices "result in employees uniformly spending most of their time on nonexempt work." *Id.* at 31; *see also Sav-On v. Super. Ct.*, 34 Cal. 4th 319, 327-28 (2004).  Because the employee's *actual* activities govern, *Duran* recognizes that the existence of a determinative uniform policy or practice is the *only* scenario in which a misclassification action may be decided on a class-wide basis:

> This is not to say that an employer's liability for misclassification may never be decided on a class basis.  A class action trial may determine that an employer is liable to an entire class for misclassification if it is shown that the employer had a consistently applied policy or uniform job requirements and expectations contrary to a Labor Code exemption, or if it knowingly encouraged uniform de facto practice inconsistent with the exemption.

*Duran*, 59 Cal. 4th at 37 (emphasis added).  Courts in the Ninth Circuit have drawn the same conclusion, finding that that the outside sales exemption cannot be resolved on a class basis without uniform policies or practices dictating where and how employees complete their job duties, which are contrary to the Labor Code exemption.  *Vinole v. Countrywide*, 571 F.3d 935, 944 (9th Cir. 2009) ("*Vinole*"); *Mevorah*, 571 F.3d 953; *In re Wells Fargo*, 268 F.R.D at 611.  There are no such uniform policies or practices here.

Although there are common documents, policies and procedures relating to SBBs, they do not create predominance because they are insufficient to decide liability.  *In re Wells Fargo*, 268 F.R.D. at 611 (finding that "fact intensive inquiries into how individual [employees] performed their job" were necessary, precluding class certification, despite the putative class members' "common job descriptions, uniform training, the same primary goal… uniform job expectations, similar compensation plans, and standardized employee evaluation standards"); *see also Mevorah,* 571 F.3d at 958 (rejecting "a presumption that class certification is proper when an employer's internal exemption policies are applied uniformly to the employees," because such an approach "disregards the existence of other potential individual issues that may make class treatment

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

difficult if not impossible."); *Soderstedt v. CBIZ Southern California, LLC*, 197 Cal. App. 4th 133, 153–154 (2011) (despite employer's uniform policies, certification properly denied due to variations in how the policies were implemented with different employees).

Further, the fact that all SBBs are classified as exempt also is not a uniform decision that supports certification. "In contrast to centralized work policies, the blanket exemption policy does nothing to facilitate common proof on the otherwise individualized issues." *Mevorah*, 571 F.3d at 959. Nor does the common classification of SBBs have any bearing on class certification. *See Vinole,* 571 F.3d at 946. As the Ninth Circuit has recognized, "focusing on the uniform exemption policy alone does little to further the . . . assessment of the relationship between individual and common issues." *Id.*; *see also Duran,* 59 Cal. 4th at 32, n.29.

### b.   SBBs' Outside Activities Can Only Be Established Through Individualized Evidence.

Here, the only way to determine how each SBB spends his or her working time would be to conduct an individualized inquiry. As the Ninth Circuit has directed, "a court evaluating the applicability of the outside sales exemption must conduct an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job description." *Vinole*, 571 F.3d at 945. To determine the percentage of time on outside sales, it is necessary to determine the total number of working hours, and then determine the number of hours spent on outside sales activities. In turn, this requires a determination of the time each SBB spent directly engaged in sales, and the time spent on related activities, such as travel time and preparation. This is particularly true because exempt outside sales activities are not just time in which the employee is actually outside visiting customers. Exempt outside sales activities also include "related activities such as preparation, travel time and paperwork." *Ramirez*, 20 Cal. 4th at 801.

While records that Plaintiffs have identified, such as SalesForce data and expense reports, would provide *some* information regarding where they conducted their job duties, they paint an incomplete picture. It would be necessary, among other things, to obtain testimony from each

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

SBB and his or her manager regarding how and where the SBB performed his or her sales duties. Under these circumstances, class certification is not appropriate. *See Casey v. Home Depot*, 2016 U.S. Dist. LEXIS 192441, *68-69 (C.D. Cal. Sept. 15, 2016) (denying class certification in case involving outside sales exemption because plaintiff did not provide common proof that would permit a class-wide determination whether employees "spend the majority of their time on non-sales activities."). In *Casey*, the plaintiffs' declaration were not "common proof" because they "provide anecdotal evidence that may not necessarily be representative of the Proposed Class." *Id.* at *69; *see also Trahan v. U.S. Bank N.A.*, 2015 U.S. Dist. LEXIS 1144, *22-23 (N.D. Cal. Jan. 6, 2015) (denying class certification because, "although there are a number of common issues," application of the outside sales exemption would require "inquiries into how much time each [employee] spent in or out of the office and how the [employee] performed his or her job"). Further, as the outside salesperson exemption depends on the percentage of working time spent on outside sales duties, it also is necessary to determine the total number of hours worked in each week. As there is no record of hours worked by SBBs in a day or week, this requires a further individualized analysis. *See* Li Decl., ¶ 4, Exh. 3, Willis Depo. at 186:19-187:2 (Plaintiff Willis acknowledging he would have no way of accurately determining hours worked in any week).

Moreover, individualized issues are more likely to predominate particularly where, as here, "employees are given much discretion as to their daily work routine." *Spainhower v. U.S. Bank Nat'l Ass'n*, 2010 U.S. Dist. LEXIS 46316, *12-13 (C.D. Cal. Mar. 25, 2010) *see, e.g.*, *In re Wells Fargo*, 268 F.R.D. at 611 (mortgage consultants operated without supervision); *Vinole*, 571 F.3d at 947 (individual consultants had "almost unfettered autonomy").

### c.    The Evidence Shows Extreme Variance In SBBs' Estimates Of Their Time Outside.

Here, it is obvious from Plaintiffs' own evidence that SBBs perform their job duties in very different ways with respect to the amounts of time spent inside and outside one of the Bank's locations; Plaintiffs' own survey results reveal a chasm of ***10% to 80%*** of working time outside in

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

their territories.  The SBBs' SalesForce data further reflects a wide variance in the number of face-to-face meetings conducted.

For this reason, there is no way that any SBB would be representative of any other SBB, and their circumstances could not be extrapolated to other SBBs.  *Vinole*, 571 F.3d at 938 (affirming denial of class certification as to outside sales exemption because employees' time "spent inside and outside the office . . . varies greatly")*see Pablo v. ServiceMaster Global Holdings, Inc*., 2009 U.S. Dist. LEXIS 79584, *17 (N.D. Cal. Aug. 17, 2009) (noting that "[t]he declarations submitted by both parties reflect substantial variation in how inspectors spend their time. Terminix's uniform policies for classifying inspectors, determining compensation, and other employment practices do not predominate over the hundreds of individualized inquiries the Court will have to perform to determine whether inspectors spend more than half their workdays doing sales outside the office") *see also Deane v. Fastenal Co.*, 2012 U.S. Dist. LEXIS 191570, *21-22 (N.D. Cal. Sept. 26, 2012) (denying class certification outside sales case because "the record here demonstrates that the amount of time spent on exempt activities varies widely between putative class members" and "the amount of time spent on exempt activities" is not subject to common proof).

Of course, the estimates provide by SBBs themselves are hardly dispositive, as both Plaintiffs and Defendant are able to test estimates offered by the SBBs, as well as their credibility. But, given the wide variance in testimony regarding the way in which SBBs perform their jobs, credibility determinations by the trier of fact are likely to be critical.  *Cf. Walsh v. Ikon Office Solutions*, 148 Cal. App. 4th 1440, 1459 (2007) (recognizing that variance in class members' testimony as to their exempt duties "underscores the likelihood that adjudicating the outside salesperson exemption will be best accomplished on an individual basis").  Moreover, to evaluate or challenge these estimates, individualized evidence will be necessary, including the testimony of the SBBs, their managers, and individualized documents and data.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

### 3.    The Bank's Reasonable Expectations, And Expressions Of Displeasure With SBBs' Performance, Require Individualized Proof And Analysis.

In assessing the applicability of the outside salesperson exemption, after determining how employees actually spend their time, a second inquiry is necessary.  *See Ramirez,* 20 Cal. 4th at 790, 802-03 (stating that "[u]nder California law, to determine whether an employee was properly classified as 'exempt,' the trier of fact must look not only to the 'work actually performed by the employee during the workweek,' but also to the 'employer's realistic expectations and the *realistic* requirements of the job'") *see also Heyen v. Safeway Inc*. 216 Cal. App. 4th 795, 828-829 (2013) (citing *Ramirez*); *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 989 (2013) (noting that "resolution of this dispute will require proof at trial not only of Sears' expectations regarding how its . . . employees perform their duties . . . but also of … whether proposed class members in fact engage primarily in nonexempt activities").  Thus, in reviewing the certification issue, the Court must examine the Bank's reasonable expectations regarding outside sales activities, including how those expectations were communicated, the SBBs' understanding of those expectations, and the managers' response to SBBs who failed to meet those expectations.

This inquiry is individualized as it includes examining whether the Bank's expectations were reasonable, the extent to which each SBB's manager communicated that expectation to the SBB, and whether the Bank provided concrete expressions of displeasure with the SBB's performance, as occurred with both Plaintiffs here when the Bank expressed its displeasure with the job performance of both Lopez and Willis, including their failure to conduct a sufficient number of face-to-face meetings with clients.

### 4.    Plaintiffs Cannot Establish That The Exemption Determination Would Be The Same For The Entire Class.

Illustrating the lack of predominance, it is possible that a trier of fact would find some SBBs to be properly exempt while others were not.  *See Mevorah*, 571 F.3d at 959 (class certification inappropriate where Wells Fargo "may have accurately classified some employees and misclassified others"); *Duran*, 59 Cal. 4th at 37 (noting that "[l]iability to one employee is in

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

no way excused or established by the employer's classification of other employees"). But, this "[w]ide variation among class members is a factor informing whether the exemption question can be resolved by a simple yes' or 'no' answer for the entire class." *Id.* at 32. As noted by the Supreme Court in *Dukes*, it is not enough for a class action to have common *questions*, the class-wide adjudication must be able to "generate common **answers**" to those questions. *Dukes*, 564 U.S. at 2551 (emphasis added). Here, the evidence suggests there may be no common answer to the question of whether SBBs spent most of their time outside. As a result, class-wide adjudication would be incapable of showing liability as to each class member.

### C.     Plaintiffs' Claims Are Not Typical Of The SBBs.

Rule 23(a)(3) requires Plaintiffs to establish their claims are "typical" of the claims of the putative class members. Plaintiffs have failed to meet this burden. The typicality analysis considers whether the putative class members suffered the same or similar injury as the plaintiffs, whether the action is based on conduct that is not unique to the plaintiffs, and whether the other class members have allegedly been injured by the same conduct. *Hanson v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Typicality is not established where, as here, the facts necessary to prove the claims are significantly different between class members or where class members have different arguments in providing liability. *See Moriskey v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 500 (D.NJ. 2000) (concluding that "a representative's claims would be atypical if his or her factual or legal stance is not characteristic of that of other class members") (internal quotations and citations omitted).

Both Lopez and Willis were counseled for failing to meet the expectations of SBBs, including as to their face-to-face meetings. Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 152:20-154:6, LOPEZ 781-784; Li Decl., ¶ 4, Exh. 3, Willis Depo. at 145:1-147:24, BANA 318-319, BANA 273. Not only were Lopez and Willis failing to meet their expectations for in-person sales activities, they assert that in-person sales activities were unimportant for their job. Lopez testified that she had no understanding of the purpose of face-to-face meetings and did not believe that face-to-face meetings were necessary to the sales process. Li Decl., ¶ 3, Exh. 2, Lopez Depo. at 173:19-

25.  Willis testified that it was "occasionally" important to have face-to-face meetings in order to put a "face to a name."  Li Decl., ¶ 4, Exh. 3, Willis Depo. at 113:12-25.

This indicates that Plaintiffs had a flawed and fundamentally different view of the SBB position – and the role of face-to-face contact with clients – than the view held by the Bank and other SBBs.  *See* Bostani Decl, ¶ 5; Cabrera Decl., ¶ 5; Jewett Decl., ¶ 5 (stating that meeting business owners face-to-face is the most effective way to conduct says and to develop relationships with those businesses).  Moreover, the Bank's 30(b)(6) witness explained that the activities of the SBBs, in particular the face-to-face meetings, are important to the SBB's job, even apart from the sales they generate.  Li Decl., ¶ 2, Exh. 1, Amaral Depo. at 169:22-170:8, 171:19-24.

Accordingly, where Plaintiffs clearly were not meeting the requirements of the SBB position, and clearly had a different (and flawed) understanding of their duties as SBBs than did the Bank, Plaintiffs are in a poor position to represent others in adjudicating the exempt status of that position.

### D.  Plaintiffs Have Not Established That The Class Device Offers A Superior Means Of Resolving These Claims.

The superiority requirement ensures that a class action would not "sacrifice[e] procedural fairness or bring[ ] about other undesirable results."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  The numerous individualized issues discussed above preclude a finding that a class action is superior, as any trial will devolve into numerous individualized mini-trials with respect to liability.  If a class trial would not result in a finding that the entire class is either properly classified *or* that the entire class is misclassified as exempt, then a separate misclassification finding must be made for each SBB, requiring a separate trial for that individual.  In these circumstances, the class action device is the wrong way to decide these claims.

Similarly, the predominance of individualized issues and manageability problems are particularly pronounced with regard to damages issues.  While courts have noted that differences in hours and damages do not by themselves prohibit certification, they present significant manageability problems here.  Plaintiffs' ability to show damages in a common way is a relevant

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

and critical consideration.  *See Comcast Corp. v. Behrend,* 569 U.S. 27, 33-34 (2013).  Plaintiffs

have offered no explanation or plan with respect to how damages could ever be managed in this

case, even assuming that liability could somehow be adjudicated on a class-wide basis.   The

highly-individualized damages inquiries (including assessments of each SBB's credibility), will

overwhelm any purported common legal questions, thereby weighing against manageability and

certification.  *See, e.g., Villa v. United Site Servs. of Cal., Inc.,* 2012 U.S. Dist. LEXIS 162922,

*30-31 (N.D. Cal. 2012) (Koh, J.).

E.     **Plaintiffs Have Provided No Manageable Trial Plan**

Particularly in light of the weight of individualized issues relating to SBBs' exempt status,

Plaintiffs must provide a manageable trial plan that explains how the case can be decided on a

class basis.  *Zinser v. Accufix Research*, 253 F.3d 1180, 1190 (9th Cir. 2001) (affirming denial of

certification where plaintiff failed to present a "manageable trial plan adequate to deal with

individualized issues"); *In re Paxil Litig.*, 212 F.R.D. 539, 548 (C.D. Cal. 2003) (recognizing that

"in the Ninth Circuit, the presentation of a preliminary, unworkable trial plan does not suffice for

class certification").  *Dukes*, 564 U.S. at 367 (rejecting "trial by formula"; evidence as to one class

member does not resolve liability question as to another).   "Any class action trial plan, including

those involving statistical methods of proof, must allow the defendant to litigate its affirmative

defenses . . . If statistical methods are ultimately incompatible with the nature of the plaintiffs'

claims or the defendant's defenses, resort to statistical proof may not be appropriate."  *Duran*, 59

Cal. 4th at 40*; see also In re Wells Fargo*, 268 F.R.D. at 612-14 (stating that statistical sampling

is "of extremely limited help to resolving the key issues," given individualized nature of outside

sales inquiry); *Vinole*, 571 F.3d at 947 (rejecting "'innovative procedural tools' such as

questionnaires, statistical or sampling evidence, representative testimony, separate judicial or

administrative miniproceedings, expert testimony, etc." where "claims require a fact-intensive,

individual analysis of each employee's exempt status"); *see also Trahan*, 2015 U.S. Dist. LEXIS

1144, at *24-25 (noting that, "as in *Duran*, Trahan's proposal to bifurcate the trial appears to

conflate the issue of whether U.S. Bank is liable to a specific class member for failure to pay

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

overtime with the damages any given class member may be owed. . . .   Trahan has neither offered a persuasive explanation as to how any testimony presented could be extrapolated across class members to establish liability nor identified a means by which U.S. Bank could 'show that its liability is reduced because some plaintiffs were properly classified as exempt'") (quoting *Duran*, 59 Cal. 4th at 38).

Here, there is no manageably way to try the outside sales exemption that safeguards the Bank's due process rights.  While their activity data provides one piece of the puzzle, it cannot answer the question of how much of the SBBs' working time was spent on outside sales duties. Data from SalesForce may show the number of face-to-face meetings logged by each SBB in a particular day or week, but that system has no data for how much *time* that any client meeting lasted, nor does it reflect the amount of time spent on related tasks such as travel and preparation for the client meeting.  And it does not reflect the time spent on other outside sales activities, such as time spent at networking and community events.  Further, as described above, the expense report data has even less value in answering the question of how much time SBBs spent on outside sales duties, as SBBs (including Plaintiffs) testified that they submitted only some (if any) of their business mileage for reimbursement.

These data sources not only have limited value in establishing time spent on outside sales duties, but they suggest widely varying levels of outside sales activities from SBB to SBB.  As a result, it is clear that an analysis of the central question in this case will also require the testimony of each SBB and his or her manager, among other individualized evidence.  Unless the Bank were given the ability to put forth this testimony and to cross-examine these witnesses, it will be prevented from putting forth its exemption defense as to each class member.

## IV.   CONCLUSION

The record plainly establishes that SBBs have widely varying work circumstances, including the amount of time they spend outside in their territory.  Although Plaintiffs and some SBBs claim to spend the majority of their time inside, many other SBBs, including many surveyed by Plaintiffs, confirm that they spend most of their time outside.  Plaintiffs have provided no way

to decide the issue of each SBB's exempt status that avoids individual evidence and individual determinations as to the overtime exemption.  As a result, Plaintiffs cannot meet the standards for class certification under Rule 23, and their Motion should be denied.


DATED:  May 22, 2019                    **McGuireWoods LLP**


                                        By:   /s/ Ashley R. Li
                                        _____
                                              Michael D. Mandel
                                              Sylvia J. Kim
                                              John A. Van Hook
                                              Lindsay Ryan
                                              Ashley R. Li
                                        Attorneys for Defendant
                                        Bank of America, N.A.

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2019, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and service via transmittal of a Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 22, 2019, at Los Angeles, California.


<u>            / s / Ashley R. Li            </u>
ASHLEY R. LI

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**