EDWARD J. WYNNE, SBN 165819
ewynne@wynnelawfirm.com
GEORGE R. NEMIROFF, SBN 262058
gnemiroff@wynnlawfirm.com
WYNNE LAW FIRM
Wood Island
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone: (415) 461-6400
Facsimile:  (415) 461-3900

*Attorneys for Plaintiffs and the putative class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA LOPEZ, SAM WILLIS, individually and on behalf of all others similarly situated, | Case No. 18-cv-02346-VC |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANT BANK OF AMERICA, N.A. AND ITS COUNSEL** |
| v. | |
| BANK OF AMERICA, NATIONAL ASSOCIATION and DOES 1 through 10, inclusive, | Date:  June 19, 2019 |
| | Time: 10:00 a.m. |
| Defendants. | Ctrm:  2, 17th Floor |
| | Judge: Vince Chhabria |

## I.   INTRODUCTION

What permeates this entire odyssey is the deafening sound of defense counsel's silence. Until this Motion, defense counsel had not provided either the Court or Plaintiffs' counsel with any of the excuses that laden the Opposition. These excuses are nothing more than carefully-worded, temporally vague, unverifiable (and unbelievable) *post hoc* reasons designed to clean up defense counsel's misrepresentations to the Court and Defendant's failures to obey, not one, but two of the Court's discovery orders. Defendant and its counsel utterly lack credibility at this point.

At the January 8, 2019 CMC, this Court made it crystal clear as to how the parties were to conduct discovery in this litigation. The Court warned that even the "slightest problem" would result in sanctions against *both* a party and its counsel. (Dkt. No. 40, p. 18:20-19:10.) The Court could not have anticipated Defendant's flagrant disregard for its discovery orders. Plaintiffs, however, carefully documented Defendant's misconduct that warrants the requested evidentiary and monetary sanctions. Ultimately, Defendant's Opposition presents the Court with more questions than answers.

## II.   DEFENDANT AND DEFENSE COUNSEL ACTED IN BAD FAITH

### A.   Why Has Defendant Only Now Attempted To Explain The Circumstances Surroundings Its Failure to Abide By the Court's Discovery Orders?

From its Opposition, Defendant would have this Court believe the discovery disputes giving rise to this Motion for Sanctions are of recent vintage when in reality Plaintiffs propounded this written discovery nearly two years ago. Defense counsel delayed, obfuscated, obstructed and flat-out ignored its agreements with Plaintiffs' counsel for a year before this conduct was brought to the Court's attention. Plaintiffs assiduously laid out the torturous course of discovery in its January 8, 2019 Case Management Conference Statement. (Dkt. No. 40, pp. 1:20-8:8.) The Court found defense counsel's conduct egregious enough to revoke the discovery referral to Magistrate Judge Kim and issue a discovery order that Defendant produce various categories of documents and data to Plaintiffs, without limitation. (*Id*. at pp. 18:17-20; 7:9-11:23, 12:19-17:2.)

Throughout this entire time not once has defense counsel ever provided Plaintiffs' counsel with an explanation. Defense counsel has never provided an explanation to Plaintiffs' counsel for Defendant's failure to meet its discovery obligations pursuant to the law; for its failure to abide by the agreements reached between the parties during meeting and conferring; or, for its failure to

obey the Court's discovery orders. When documents have been (belatedly) produced, no cover letter would accompany the production, just a link and password. At no point has defense counsel even placed a phone call, sent an email, or even responded to one of Plaintiffs' counsel's emails clarifying any aspect of the deficient productions. Indeed, defense counsel has failed to respond most recently to a May 20, 2019 email from Plaintiffs' counsel concerning discrepancies in the Salesforce Data produced on May 17, 2019. (Decl. of Wynne, ¶ 2.) At this point, given defense counsels' conduct and the deficient productions, how could Plaintiffs' counsel believe defense counsel is being forthright? More importantly, given defense counsel's response (or lack thereof), how could Plaintiffs' counsel not continue seeking the unproduced discovery?

The paucity of explanation from Defendant and its counsel should not be lost on the Court. At no point has Defendant ever provided the Court with an explanation for its failure to abide by its discovery orders. Plaintiffs' counsel has submitted numerous letters to the Court regarding Defendant's repeated, flagrant noncompliance with the Court's orders, yet Defendant has not submitted one letter in response. If Defendant actually had reasonable explanations for why it could not comply with the Court's discovery orders, why did defense counsel not say so? The answer to this question is that defense counsel and Defendant did not have a good answers.

### B.  Why Did Defendant Not Produce the Salesforce Data In the Normal Course of Discovery?

Most importantly, Defendant did not ever voluntarily produce the Salesforce Data to Plaintiffs. During the parties' meeting and conferring, defense counsel had agreed to produce the Salesforce Data. Defense counsel then repeatedly failed to do so. Defendant only produced the Salesforce Data after Plaintiffs sought and obtained an order from the Court during the January 8, 2019 CMC and even then defense counsel thereafter failed to abide by the Court's orders.

### 1.  Why Did Defendant Produce The Limited Salesforce Data on January 29, 2019?

Defendant's Opposition repeatedly emphasizes that "2.3 million lines of data" were produced pursuant to the Court's first order's production deadline of January 29, 2019. (Dkt. No. 64, p. 4.)  Despite the Court's unambiguous order to produce **_ALL_** Salesforce Data for the putative class, defense counsel now *admits* that *he took it upon himself* to decide what Salesforce Data to produce. (Dkt. No. 64-1, ¶8.) He then whittled the data down to just three fields. (*Id*.) Plaintiffs'

counsel raised the deficient production with defense counsel. Defense counsel provided no explanation for the limited data prior to the parties submitting a joint letter brief to the Court. (Dkt. No. 52.) In the joint letter brief, defense counsel then materially misrepresented the nature of the Salesforce Data; in particular, stating that it did not identify the location of face-to-face meetings. (See Dkt. No. 52, pp. 4.) Plaintiffs attached an exemplar of the Salesforce Data as an exhibit pointing out that no reasonable person would believe that what Defendant produced is what Defendant's supervisors and SBBs use on a day-to-day basis. (Dkt. No. 52, Exhibit 1 "Salesforce Data Exemplar".) The Court agreed with Plaintiffs and issued the second discovery order. (Dkt. No. 53.) In all, Defense counsel admits that despite the Court's order, he suppressed data in the January 29, 2019 production and then misrepresented the nature of the data to the Court in order to avoid producing the rest. This is not substantial compliance; this is bad faith.

### 2. Why Did Defendant Only Produce A Limited Sample Of Salesforce Data on April 22, 2019?

Again, without explanation, Defendant produced additional Salesforce data on April 22, 2019. The production confirmed defense counsel's bad faith. The Salesforce data contained significantly more fields than the January 29, 2019 production, including one that critically indicated the location of SBB face-to-face meetings and the employer's physical address. (Dkt. No. 52-1, Ex. 1 (Jan. 29, 2019 Salesforce Data Exemplar); Dkt. No. 61-1, Ex. 3 (April 22, 2019 Salesforce Data Exemplar).) Furthermore, Defendant did not even comply with the Court's order to produce _**ALL**_ the Salesforce Data for the putative class. Defendant only produced a sampling of 19 class members for the brief time period of September 1, 2018 to April 3, 2019. Defense counsel does not offer any justification for why he chose a sampling as opposed to fully complying with the Court's order; he appears to have simply disregarded it. This is not substantial compliance; this is _more_ bad faith.

### 3. Why Is the Salesforce Data Produced on May 17, 2019 Different from the April 22, 2019 Production?

Defendant and its counsel seek to avoid the consequences of their conduct by claiming that they have now produced all the Salesforce data for the putative class as of May 17, 2019. Notably, this production was made _after_ Plaintiffs were forced to file this Motion and, consistent with the prior productions, no cover letter or explanation was provided for the production; just an email with

a link and password to download the data. And consistent with Defendant's other productions, Plaintiffs' counsel was able to easily ascertain that Defendant has *still* has not complied with the Court's order. Specifically, there are discrepancies between the fields of the data in the 19-person sample produced on April 19, 2019 and the May 17, 2019 production. (Decl. of Wynne, ¶ 3.) The May 17th Salesforce data is also incomplete because it stops as of December 31, 2018, meaning that Defendant has not produced data from January 2019 to a date close to the present. (*Id.*) This data *must* exist because Defendant's 19-person sample of data extends until April 3, 2019! (*Id.*) Defendant claims this is substantial compliance; this is *even more* bad faith.

### C. Why Has Defendant Not Produced Any SBB Partnership Agreements and Financial Manager SBB Checklists For the Putative Class?

Despite the Court's order, to-date Defendant has not produced a single SBB Partnership Agreement or a SBB-Financial Center Checklist for a putative class member. (Dkt. No. 53; Decl. of Wynne, ¶ 5.)

#### 1. Why Does Defense Counsel Deny He Knew Of A Document That Was Produced By Plaintiffs Well-Over A Year Ago?

Defense counsel John Van Hook states that he did not know of the SBB Partnership Agreement until Plaintiffs produced the document in discovery. (Dkt. No. 64-1, ¶ 3.) He omits one critical fact: Plaintiffs' produced the document to Defendant well-over a year ago on March 19, 2018. (Decl. of Wynne, ¶ 4.) Putting aside for a moment that Plaintiffs produced an exemplar of the documents they seek well-over a year ago, how could he not know of this document until now? The document sets forth an expectation for SBBs to be physically at the branches they cover for an entire day. In other words, it goes to the crux of Defendant's affirmative defense of the outside sales exemption. Given the importance of this document (among others Plaintiffs have identified), defense counsel's explanations ring hollow and are simply not credible.

#### 2. Why Has Defendant Not Conducted A Reasonable And Diligent Search For the SBB Partnership Agreements and Checklists?

Defense counsel also admits that these documents exist, but he has not conducted a reasonable and diligent search for the records. (Dkt. No. 64-1, ¶ 3.) Preliminarily, Plaintiffs do not concede that these documents were not used to manage SBBs; that is Defendant's contention. Moreover, such a contention strains credulity. If an "agreement" between the SBB and the Financial Center Manager about the tasks the SBBs were to perform and when and how they were

to perform them was not used to manage the SBBs, then what was its possible purpose? To frame the question is to answer it. Clearly, these are material documents reflecting Defendant's expectations for the position which were used to manage SBBs.

Defense counsel speculates that putative class members may be in possession of these documents. This may be true but it completely misses the point. The discovery has been sought from Defendant – not putative class members. Regardless, defense counsel admits that they may be "in the possession of the Financial Center Managers ("FCMs")." (Dkt. No. 64, p. 5.) Of course they are. And Defendant, with its vast financial resources, surely has the capability to confirm whether its Financial Center Managers have maintained these documents. Defense counsel states that "1,650 emails were sent; to date 592 responded." (Dkt. 64-1, ¶ 12.) Counsel's statement does not state when this email was sent. This omission was no accident. Plaintiffs suggest that the email was most likely *after* this motion was filed given the fact that only 592 out of 1,650 of its current employees responded to a direct order from their employer.

Defense counsel makes the statement that Plaintiffs are "insisting" that these documents be produced. Yes, Plaintiffs are insisting that *all* relevant documents be produced pursuant to Court order. Defense counsel statement in this regard is a non-sequitur and simply serves to underscore the inescapable conclusion that Defendant and its counsel have acted in bad faith.

### D.  Why Has Defendant Not Produced The 2015 and 2016 Job Descriptions?

Defense counsel does not deny that the 2015 and 2016 Job Descriptions exist, just that Defendant cannot locate them. It is simply not credible that Defendant cannot locate a document that is updated annually and sets forth the expectations for hundreds of its employees throughout California. Plaintiffs' counsel has litigated scores of wage and hour class actions against financial institutions, including cases against this very Defendant, and not once has he encountered a defendant, including this one, who could not locate a job description. (Decl. of Wynne, ¶ 6.)[1] The 2015 and 2016 Job Descriptions are critical evidence because, in addition to setting forth Defendant's expectations for the SBB position, these are the last job descriptions prior to the inception of this litigation in 2017. Plaintiffs suspect that information contained in these withheld documents undercuts Defendant's affirmative defense of the outside sales exemption. Defendant's

---

[1] Moreover, Defense counsel claims that Defendant has produced Job Descriptions for 2012-2014. Plaintiffs are not aware of these documents, nor has Defense counsel provided a Bates Stamp number in their papers.

failure to produce such a fundamental and ubiquitous document reeks of bad faith.

### E. Why Has Defendant Not Produced All the Highlighted Links to Documents in the SBB Playbook?

Defense counsel admits that he willfully failed to produce these documents until now despite the Court's April 15, 2019 Order. (Dkt. No. 64, p. 6.) Defendant would rather re-argue the relevancy of these documents in this Motion for Sanctions than actually abide by the Court's discovery order and produce them. This is *more* bad faith.

### F. Why Has Defendant Not Produced All The Training Materials Requested By Plaintiffs?

Defense counsel admits that Defendant has not complied with the Court's April 15, 2019 discovery order by producing the training documents. (Dkt. No, 64, p. 6.) Defendant was required to produce "all trainings provided to SBBs, during the statutory period, including, but not limited to, trainings highlighted by Plaintiffs in their December 21, 2018 meet and confer correspondence to Defendant." (Dkt. No. 53, p. 1-2.) Defense counsel received on multiple occasions Plaintiffs' December 21, 2018 meet and confer correspondence with the highlighted training transcript exhibit. (Decl. of Wynne, ¶ 7.) The highlighted training transcript was that of named Plaintiff Samuel Willis who worked for Defendant from 2017 to 2018. Many of these training courses dealt with sales-related activity which is highly relevant to Defendant's affirmative defense of the administrative exemption. (Dkt. 32, ¶ 10.) Not until Defendant's Opposition to Class Certification did Plaintiffs learn that Defendant has apparently abandoned the administrative exemption. More importantly, these are current training courses and surely in Defendant's possession. Defendant has simply chosen not to produce them until they faced this Motion for Sanctions. Still *more* bad faith.

## III.   SANCTIONS ARE WARRANTED

This Court has awarded evidentiary sanctions for conduct far less egregious than Defendant and its Counsels' in the instant case. See, *Unwired v. Apple, Inc.*, N.D. Cal. Case No. 3:13-cv-04134-VC, Dkt. No. 627 (excluding testimony at trial for party's failure to supply corrective material that had already been disclosed). The Court has also previously awarded attorneys' fees as a sanction against both a defendant and its counsel in an amount far greater than the amount requested by Plaintiffs here. See, *Segan LLC v. Zynga, Inc*., N.D. Cal. Case No. 3:14-cv-01315-VC, Dkt. No. 246 (awarding $100,000 in monetary sanctions pursuant to Court's inherent authority).

### A.  The Requested Evidentiary Sanctions Are Warranted

Defendant is incorrect that Plaintiffs applied the wrong test to evaluate the imposition of evidentiary sanctions. The correct standard is set forth in *Jang v. Sagicor Life. Ins. Co.*, 2019 WL 699791 (C.D. Feb. 20, 2019) as cited by Plaintiffs. There, the district court applied the five-part test utilized by Plaintiffs in analyzing a similar fact pattern of discovery abuse and found evidentiary sanctions were warranted. *Id*. at *4-6 ("The Ninth Circuit has articulated a five-part test for evaluating whether a party's requested evidentiary sanctions are appropriate . . . ."). Despite arguing that Plaintiffs have failed to set forth the correct standard, Defendant noticeably fails to articulate what it believes the "correct" standard to be.

Defendant and its counsels' bad faith conduct meets the standard for the imposition of evidentiary sanctions. Defendant's Opposition is nothing but a series of conclusory statements that Plaintiffs cannot meet the factors. Defendant first leads with the fourth factor – tacitly acknowledging its strongest argument – that public policy favors dispositions on the merits. While that is no doubt a valid interest, the Court also has an equally valid interest in deterring flagrant disregard for its discovery orders. Moreover, the sanctions that Plaintiffs seek at this time are not terminating sanctions. Thus, this case will be heard on the merits.

Defendant then argues the fifth factor by contending Plaintiffs have identified lesser sanctions but fails to identify what those lesser sanctions were.

Defendant then addresses the third factor, i.e., the risk of prejudice to the party seeking sanctions, and argues Plaintiffs have not suffered any prejudice. Defendant nakedly asserts that Plaintiffs have not suffered any prejudice because the Salesforce data is not dispositive. The test is not whether the discovery sought is dispositive. The test is whether Plaintiffs have been prejudiced. Clearly, the Salesforce data is, at a minimum, highly relevant to the claims and defenses of this litigation. Stated another way, Defendant would not have flagrantly disregarded not one, but *two* Court orders, if it did not want to keep this data from Plaintiffs. If it was so useless, then why go to such lengths to keep it from Plaintiffs and their expert? The reason is simple. It is highly relevant data because it is a contemporaneous record, recorded by the SBBs themselves, of where they physically did their jobs and it is a record they were instructed to keep and a record they were managed to. Defendant's attempt to discount the importance of this data utterly fails. Compounding

the prejudice, Defendant did not produce the most recent version of the Salesforce data until *after* Plaintiffs' Motion for Class Certification was filed.

The Court should not overlook that Plaintiffs propounded this discovery in August 2017. Plaintiffs have not had this information for nearly two years. Plaintiffs have propounded additional discovery, taken depositions, prepared for Settlement Conferences, and prepared a Motion for Class Certification without a complete Salesforce data set. Defendant's argument that Plaintiffs are not prejudiced because they have developed other evidence both ignores the issue and is completely tone deaf. The issue is Defendant's and its counsel's non-compliance. The fact that Plaintiffs' counsel have not sat on their hands does not somehow excuse this behavior.

With respect to the unproduced SBB Partnership Agreements and Checklists, Defendant's argument that there is no dispute regarding these documents is misleading. No one disputes the contents of the documents; however, Defendant's assertion that SBBs' managers did not "manage to" these documents is not credible. Noticeably, Defendant has failed to stipulate that the Partnership and Checklists are representative for the entire putative class. Had Defendant actually conducted a reasonable, diligent search and produced the documents pursuant to the Court's order, Plaintiffs would be able to advance arguments regarding the documents' representativeness. This is where the prejudice to Plaintiffs lies. Plaintiffs are prejudiced because they are not able to advance theories at class certification (or present them as robustly) using this evidence because Defense counsel has acted in bad faith by suppressing this information. Defendant's assertions that the documents are not relevant or that Plaintiffs are seeking individualized discovery are just attempts to re-litigate the joint letter brief and the class certification motion. In all, Defendant's arguments regarding the SBB Partnership Agreements and Checklists are hollow and obfuscating. The Court should disregard them.

Defendant provides a laundry list of what documents it has produced. Preliminarily, it appears Defendant believes that it can ignore the Court's discovery orders once it decides it has met an arbitrary threshold of documents it deems sufficient for Plaintiffs to advance their arguments in support of class certification. Moreover, Defendant's list is misleading. The "thousands of documents produced" are actually approximately 1,900 *pages*. Many of these *pages* are contained in multiple editions of manuals, handbooks and guidelines that are hundreds of pages

long, e.g., Code of Conduct, Global Expense Standard policy, and Incentive Plan Manual. Still other documents, while certainly relevant, have been produced in multiple formats and therefore duplicative, e.g., SBB Playbook. The point is not the number of pages or even the number of documents that Defendant has produced. The question is whether Defendant has produced what it has been ordered to. The undeniable answer is that it has not.

### B.  Defense Counsel's Misrepresentations to the Court are Well-Founded

Plaintiffs have shown that Defense counsel John Van Hook made material misrepresentations to the Court in bad faith. Counsel's attempt to explain it all away falls well short of the mark. Assuming *arguendo* that defense counsel's conduct did not arise to bad faith (it did), it is, at a minimum, gross negligence. *This discovery has been pending for nearly two years*. Defense counsel knows or should know Defendant's case by now.  Likewise, it is completely reasonable for Plaintiffs' counsel and the Court to assume that defense counsel is aware of the information generally contained in data that the parties have extensively met and conferred about, was the subject of a motion to compel, was ordered produced by the Court on two separate occasions, and is some of the most critical evidence in the case. Defense counsel now, for the first time, offers the Court and Plaintiffs the explanation that he did not know what information his client tracked using Salesforce. This is not a credible explanation. How could he not know of the "new" Salesforce data that Defendant had begun collecting in 2018 – during the pendency of this litigation – and likely based on his firm's advice?

Defendant attempts to explain away defense counsel's misrepresentations regarding the SBB Partnership Agreement. At the time the joint letter brief was submitted, defense counsel was aware of the SBB Partnership Agreements, and most certainly aware of the Checklists, yet he nevertheless misrepresented that the former was not used in the relevant period when it clearly was. How could defense counsel not know this information after litigating this case for nearly three years? His statement lacks credibility. If the Court finds that Counsel did not act in bad faith, at a minimum he acted with gross negligence which is a sufficient basis to impose the requested evidentiary sanctions.

### C.  Monetary Sanctions Would Be Just

Repeating the phrase "good faith" does not make it so. The evidence shows no *indicia* of

good faith during this entire episode. It is a fairly uncommon occurrence to have a court issue an order compelling discovery responses. Usually counsel are able to work out their differences prior to invoking judicial intervention. Having *two* court orders compelling compliance on the same issue is nothing short of unprecedented. Plaintiffs' counsel has never experienced such a circumstance in his career. (Decl. of Wynne, ¶ 6.)

Moreover, Defendant's production of the Salesforce Data has been anything but "prompt." After failing to produce this information on the court-ordered production date, the "complete" Salesforce data was produced *after* Plaintiffs' Motion for Class Certification and the instant Motion for Sanctions were filed. The timing of the production begs the question whether Defendant would have *ever* complied with the Court order and produced more than 19-person sample had Plaintiffs not filed this Motion. The same question applies to any documents subject to the Court's order that remain outstanding. The lag between the Court's second April 15, 2019 order production deadline and Defendant's May 17, 2019 production leads to the reasonable assumption that Defendant had not previously collected this data. Likewise, Defendant has conveniently never identified any dates, let alone any reason, for the delays associated with the collection and production of documents or data in this case. Had defense counsel provided these dates, the full extent of Defendant's bad faith would have been apparent.

With respect to Defendant's legal authority cited, none of those cases involved a situation where *two* discovery orders were violated. Plaintiffs' counsel has offered the Court an *in camera* inspection of their billing records if the Court deems it appropriate. If such is the case, Plaintiffs request that defense counsel's time-sheets be produced as well. In a similar vein, Plaintiffs cited to a recent ruling by Judge Chen who approved Plaintiffs' counsel's hourly rates finding them appropriate. If the Court wants to further assess the basis for Plaintiffs' counsels' hourly rates, Plaintiffs are willing to submit supplemental briefing expounding on how their qualifications warrant their claimed hourly rates.

Dated: May 29, 2019                    WYNNE LAW FIRM

                                       By: /s/ *Edward J. Wynne*
                                           Edward J. Wynne
                                           George R. Nemiroff
                                       Attorneys for Plaintiffs
                                       Laura Lopez and Sam Willis