EDWARD J. WYNNE, SBN 165819
ewynne@wynnelawfirm.com
GEORGE R. NEMIROFF, SBN 262058
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
Wood Island
80 E. Sir Francis Drake Blvd., Ste. 3G
Larkspur, CA 94939
Telephone: (415) 461-6400
Facsimile: (415) 461-3900

*Attorneys for Plaintiffs and the putative class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA LOPEZ, SAM WILLIS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, NATIONAL ASSOCIATION and DOES 1 through 10, inclusive, <br><br> Defendants. | **Case No. 18-cv-02346-VC** <br><br> **PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION FOR CLASS CERTIFICATION** <br><br> DATE: June 19, 2019 <br> TIME: 10:00 a.m. <br> DEPT: Courtroom 2, 17th Floor <br><br> Hon. Vince Chhabria |

## **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     DISCUSSION.......................................................................................................1

        A.      Plaintiffs' Evidence is Substantial and Compelling ....................................1

                1.      The Salesforce Data Support A Finding Of Predominance............................1

                2.      The Expense Reimbursement Records Support a Finding of
                        Predominance ..........................................................................3

                3.      BofA Admits that It Has No Expectation for SBBs to be Primarily
                        Outside...................................................................................5

                4.      The SBB Position Lacks The Hallmarks Of A True Outside Sales
                        Position ..................................................................................5

        B.      Defendant Ignores Plaintiffs' Theory of Liability......................................6

                1.      The Predominant Common Question Here Is Objective and Binary .............8

                2.      Defendant's Authorities Support Class Treatment Under The Facts Here .....8

                3.      Defendant Has No Relevant Evidence Showing Material Variation ...........10

                4.      Credibility Determinations Do Not Preclude Certification .........................12

        C.      The Class Representatives are Typical and Adequate................................13

        D.      This Class Action Is Manageable and a Superior Method of Adjudication ..............14

III.    CONCLUSION ...................................................................................................15

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION FOR CLASS CERTIFICATION
18-cv-02346-VC

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abdullah v. U.S. Sec. Assocs.*,
    731 F.3d 952 (9th Cir. 2013) ............................................................................................. 10

*Ambrosia v. Cogent Comm'ns*,
    312 F.R.D. 544 (N.D. Cal. 2016) ........................................................................................ 9

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................................................ 14

*Fjeld v. Penske Logistics, LLC*,
    2013 WL 8360535 (C.D. Cal. Aug. 9, 2013) .................................................................... 12

*Haley v. Medtronic*,
    169 F.R.D. 643 (C.D. Cal. 1996) ...................................................................................... 13

*In re Paxil Litigation*,
    212 F.R.D. 539 (C.D.Cal.2003) ........................................................................................ 15

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
    571 F.3d 953 (9th Cir. 2009) ..................................................................................... 8, 9, 12

*In re Wells Fargo Home Mortg. Overtime Pay Litigation*,
    268 F.R.D. 604 (N.D. Cal. 2010) .................................................................................. 8, 12

*Jewel Tea Co. v. Williams*,
    118 F.2d 202 (10th Cir. 1941) ............................................................................................ 5

*Kamar v. Radio Shack Corp.*,
    254 F.R.D. 387 (C.D. Cal. 2008) ...................................................................................... 10

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................................................. 14

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands*,
    244 F.3d 1152 (9th Cir. 2001) ........................................................................................... 10

*Martino v. Ecolab*,
    2016 WL 614477 (N.D. Cal. 2016) .................................................................................... 9

*McLeod v. Bank of Am., N.A.*,
    No. 16-CV-03294-EMC, 2017 WL 6373020 (N.D. Cal. Dec. 13, 2017) ........................... 4

*Peterson v. Alaska Commc'ns Sys. Grp.*,
    328 F.R.D. 255 (D. Alaska 2018) ...................................................................................... 9

*Rosenberg v. Renal Advantage*,
    2013 WL 3205426 (S.D. Cal. June 24, 2013) ................................................................... 12

*Stuart v. RadioShack Corp.*,
    641 F.Supp.2d 901 (N.D. Cal. 2009) .................................................................................. 4

*Trahan v. U.S. Bank National Association,*
   No. 4:2009cv03111 (N.D. Cal. 2015) ...................................................11

*Troy v. Kehe Food Distributors,*
   276 F.R.D. 642 (W.D. Wash. 2011) .......................................................9

*Vinole v. Countrywide Home Loans,*
   571 F.3d 935 (9th Cir. 2009) .........................................................passim

*Wal-Mart Stores v. Dukes,*
   564 U.S. 338 (2011) ...................................................................7, 11

*Zinser v. Accufix Research Institute,*
   253 F.3d 1180 (9th Cir. 2001) .............................................................14

## STATE CASES

*Duran v. U.S. Bank Nat. Assn.,*
   59 Cal.4th 1 (2014) ..................................................................6, 7, 11

*Martinez v. Joe's Crab Shack Holdings,*
   231 Cal.App.4th 362 (2014) ............................................................7, 8

*Ramirez v. Yosemite Water Co.,*
   20 Cal.4th 785 (1999) ................................................................passim

*Sav-On Drug Stores, Inc. v. Superior Court,*
   34 Cal.4th 319 (2004) ...............................................................10, 13

*Soderstedt v. CBIZ,*
   197 Cal.App.4th 133 (2011) ..............................................................12

*Walsh v. IKON,*
   148 Cal.App.4th 161 (2007) ...........................................................8, 10

## STATUTES, RULES & REGULATIONS

California Code of Regulations, Title 8,
   § 11040(2)(M) ............................................................................10

Evid. Code,
   § 403 ....................................................................................12

Evid. Code,
   § 611 ....................................................................................12

Fed R. Civ. P.,
   Rule 23 .............................................................................10, 14

Fed. R. of Evid.,
   § 602 .....................................................................................4

Labor Code,
   § 2802 ....................................................................................4

## I.     INTRODUCTION

Defendant has made this Court's job very easy. Defendant's opposition is singularly remarkable for its lack of gravitas. Just one sentence into its brief, Defendant goes awry. Defendant ignores Plaintiffs' theory of the case. Defendant fails to address Plaintiffs' cases. Defendant fails to rebut Plaintiffs' substantial and evidence. Defendant's own evidence lacks any appreciable weight. Defendant's analysis lacks persuasiveness and otherwise misses the point. Defendant's lackluster effort merely serves to underscore why certification is warranted.

Defendant has failed to contest the following facts: (1) the only document that sets forth an expectation for SBBs to be outside a majority of the time was never given to the SBBs and Defendant's own 30(b)(6) witness had never seen it; (2) the contemporaneously created Salesforce records and mileage expense records show that SBBs had minimal outside sales activities; (3) SBBs are expected to and do work overtime hours without compensation; (4) Defendant has detailed expectations for daily, weekly and monthly activities for SBBs that are common to the class; (5) SBBs are subject to common policies, procedures and compensation plans incentivizing similar behavior; (6) SBBs work in teams and in partnerships with constant supervision from their Sales Managers; (7) SBBs have never been instructed or trained to be outside most of the time; (8) Defendant has no compliance program; and, (9) there are no concrete expressions of employer displeasure regarding the amount of time SBBs are in or out.

These facts support the conclusion that the question of whether Defendant's outside sales expectation is realistic, is the predominant common question warranting class treatment.

## II.     DISCUSSION

### A.     Plaintiffs' Evidence is Substantial and Compelling

#### 1.     The Salesforce Data Support A Finding Of Predominance

Defendant makes no real effort to dispute the substantial and compelling evidence from its own contemporaneously created Salesforce records. Underscoring this point is the complete omission from any of Defendant's declarants disavowing or casting doubt on the accuracy of their own records.

Subsequent to Plaintiffs filing their moving papers, Defendant produced additional Salesforce records for 486 SBBs covering the period from January 1, 2013 to December 31, 2018. The data show that SBBs had 7.20 face-to-face meetings per week on average. (Second Suppl. Decl. of Steward, ¶ 3.)

The data show that over 60% of the SBBs had 7.2 *or less* face-to-face meetings per week. (*Id*.) This data is entirely consistent with the previously produced data of the 19 SBBs which show that those SBBs had 7.14 face-to-fees meetings per week on average – regardless of location. (Dkt. 58-22, Suppl. Decl. of Steward, ¶ 5, Table 2.) The previously produced data from the 19 SBBs can be extrapolated to the larger data set because there is no statistical difference between the two. (Second Suppl. Decl. of Steward, ¶¶ 6-7.)

The larger data set of the 486 SBBs that Defendant most recently produced on May 17, 2019, is not in the same format as the earlier data for the 19 SBBs produced on April 23, 2019. Specifically, the larger data set does not differentiate where the customer meetings took place. (Second Suppl. Decl. of Steward, ¶ 1.) In other words, the previously produced data of the 19 SBBs identifies whether the face-to-face meeting was at the small business, at the financial center, or at "other." The previously produced data of the 19 SBBs show that those SBBs had an average of 4.7 face-to-face meetings per week at the customer's business (including the meetings designated as "other") and about 2.5 meetings per week on average at the financial center. (Dkt. 58-22, Suppl. Decl. of Steward, ¶ 5, Table 2.) Accordingly, it is reasonable to extrapolate the same ratio of face-to-face meetings at the small business versus the financial center to the larger data set of 486 SBBs, i.e., two-thirds to one-third. (Second Suppl. Decl. of Steward, ¶¶ 8-9.) In other words, Defendant's own contemporaneously created data show that <u>SBBs had less than 5 face-to-face meetings outside of the financial center per week on average.</u>

Based on the uncontested evidence that customer meetings lasted between 1-1.5 hours, SBBs are engaged in face-to-face meetings outside of the financial center for, at most, 7.5 hours a week. The significance of this data is readily apparent. Even if this amount is doubled – *or even tripled* – it is substantial and compelling evidence that Defendant's affirmative defense of the outside sales exemption is meritless because SBBs spent most of their time inside a financial center. It is also substantial and compelling evidence that there are no material differences between the experiences of the class members thus warranting class certification.

Rather than argue that the Saleforce records are inaccurate, Defendant instead points to outliers arguing that some SBBs have had 15 meetings per week and 74 SBBs report more than 10 meetings per week. This statement both misrepresents the data and is completely unremarkable. First,

exactly <u>one person</u> had a *median* of 15 face-to-face meetings per week which represents just .2% of the general population. Second, 74 SBBs represent just 15% of the total population and 10 face-to-face meetings per week would account for, at most, 15 hours of an SBB's time – still well-below half of the 55.3 hours per week reported by Plaintiffs' declarants. (Suppl. Decl. of Wynne, ¶ 2.) Third, the larger data set does not identify where the meetings took place so it necessarily includes meetings at the branch. Thus, applying the same two-thirds ratio, at 10 meetings per week on average, these 74 SBBs would have approximately 7 meetings per week at the customer's place of business which would account for just 10.5 hours outside of the financial center.

**2.      The Expense Reimbursement Records Support a Finding of Predominance**

Defendant does not seriously address its own mileage expense records. Defendant does not contest Dr. Steward's conclusion that the mileage records show "little to no ground travel business expenses each month." (Dkt. 58-21, Steward Decl., ¶ 5.) In addition, Defendant does not contest that: (1) 90% of the SBBs averaged less than one mileage reimbursement request per month; (2) 42% of the SBBs have mileage reimbursement requests of less than $2 while 72% of the SBBs have requests less than $30 per week; (3) almost half of the SBBs drove less than 5 miles per week while over 60% drove less than 30 miles per week; and, (4) the average and median number of miles driven by SBBs comes to just 38 and 14.5 miles per week, respectively. (*Id.*, ¶¶ 11-13.) Defendant does not contest that these records are consistent with the Salesforce records and likewise show that SBBs spent more time inside than out.

In the face of this substantial and compelling evidence, what does Defendant do? It points to the deposition testimony of the two named plaintiffs. However, assuming Defendant's representations are correct (they are not), the testimony of the two named plaintiffs well-after the events in question does not impeach Defendant's own contemporaneously created mileage records of the 47 randomly chosen SBBs.

Moreover, Defendant takes liberties with the cited evidence. Defendant argues the Plaintiffs walked to their outside appointments (and thus did not incur mileage). However, Willis actually testified he walked to see a client just *twice* – an amount entirely consistent with is testimony that he spent more time in the financial center than out. (Ex. 1, Suppl. Wynne Decl., Willis Depo., p. 49:18-22; Dkt. 58-32, Willis Decl., ¶ 10.) Lopez testified that she covered three branches and of those, one

1    of them had some customers within walking distance which allowed the customers to *walk to her at*
2    *the branch*. In response to counsel's question of whether she ever walked to them, she acknowledged
3    that she did. (Ex. 2, Suppl. Wynne Decl., Lopez Depo., pp. 50:10-13; 213:2-13.) However, such
4    testimony is entirely consistent with her testimony that she spent most of her time inside rather than
5    out and that 75% of her meetings were at the branch. (Dkt. 58-29, Lopez Decl., ¶ 10; Ex. 2, Suppl.
6    Wynne Decl., Lopez Depo., p. 111:2-8.) Willis carpooled to clients on occasion but it happened one
7    in twenty times. (Ex. 1, Suppl. Wynne Decl., Willis Depo., p. 49:23-50:7.) Lopez's manager did
8    instruct Lopez not to submit any mileage reimbursement requests, however, unless Defendant is
9    conceding that Lopez's manager was following company policy (and thus admitting liability for the
10   Labor Code § 2802 claim), one manager's instruction in 2013 does not refute the records of 47
11   randomly chosen SBBs.[1]

12        Defendant's declarants do not somehow negate the significance of Defendant's own
13   contemporaneously created mileage reimbursement records. Aside from providing further evidence
14   that Defendant is liable under the Section 2802 for unreimbursed mileage that it knew was being
15   incurred yet did nothing about,[2] the declarants merely aver that "sometimes" they did not submit
16   mileage for short trips. None of them state the frequency or amount of these "short trips" or quantify
17   in any way how many miles or how many trips they did not record. The vague and ambiguous
18   testimony of Defendant's five hand-picked declarants simply does not counter the weight to be
19   afforded to the randomly drawn data of 10% of the class. Indeed, assuming *arguendo* that Defendant's
20   declarants' testimony was representative of the class, it is entirely consistent with Dr. Steward's
21   findings. If SBBs as a whole did not sometimes record short trips, such a fact would not have a
22   material effect due to the fact that Defendant's own records show "little to no ground travel."[3]

---

[1] Lopez belief that other SBBs may have followed her manager's instruction is inadmissible conjecture and speculation. Fed. R. of Evid. § 602, 701. In fact, Lopez stated that she never talked to other SBBs about whether they were submitting mileage expense requests. (Ex. 2, Suppl. Wynne Decl., Lopez Depo., p. 137:11-15.)

[2] See, *Stuart v. RadioShack Corp.*, 641 F.Supp.2d 901, 904 (N.D. Cal. 2009) (finding viable claim under § 2802 where defendant knew or should have known of expenses being incurred that were unreported); *McLeod v. Bank of Am., N.A.*, No. 16-CV-03294-EMC, 2017 WL 6373020, at *8-*10 (N.D. Cal. Dec. 13, 2017) (same; granting class certification on § 2802 claim regarding BofA loan officers).

[3] Similarly unremarkable is Defendant's reliance on the outside networking activities as testified to by two of Defendant's declarants. Cabrera's outside networking equates to just 2.25 hours per week while Bostani's equates to just 45 minutes per week. Out of a typical 55 hour week, this amount is negligible.

**3.      BofA Admits that It Has No Expectation for SBBs to be Primarily Outside**

Defendant states that "SBBs are expected to primarily work out in the territory" citing Amaral's testimony. However, he said no such thing. In the first citation, he merely stated that being in front of the client and going to their place of business was their "niche." (Dkt. 63-2, Li Decl., Ex. 1, Amaral Depo., p. 30:1-3.) Neither this statement nor anywhere else in his deposition did Amaral state that SBBs were expected to be primarily outside. The second citation has absolutely nothing to do with the proffered evidence. (Id., p. 55:5-22.) The reality is that Amaral never instructed an SBB to be outside more than half of the time, no one has ever told him that was an expectation, and he had never seen the Job Description before his deposition.

If Amaral had never seen the Job Description before, it is no wonder that the SBBs have never seen it either. With this document existing in a vacuum, Defendant's claim that it actually has an expectation for its SBBs to be outside is highly dubious. Indeed, Defendant's declarants admit that BofA has never given them a specific expectation for the time they are to be outside. (Cabrera Decl., ¶ 10, "*my manager has never given me a specific percentage of my working time that I need to spend outside in the territory*"; Bostani Decl., ¶ 10, same; Jewett Decl., ¶ 9, same; Navarro Decl., ¶ 9, same.)

**4.      The SBB Position Lacks The Hallmarks Of A True Outside Sales Position**

The SBB position does not carry any of the hallmarks of a true outside sales position. In discussing the outside salesperson exemption, one of the authorities relied upon by Defendant, *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935 (9th Cir. 2009) *Jewel Tea Co. v. Williams*, 118 F.2d 202 (10th Cir. 1941). In *Jewel Tea*, the court identified the indicia of an outside salesperson as follows:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. 118 F.2d at 207-208.

The traveling salesmen described in *Jewel Tea* are a far cry from the SBBs here. First, SBBs are primarily paid a salary and are eligible for incentive pay which makes up but a small portion of the

SBBs' total compensation.[4] Second, SBBs do not work individually. They work in "teams" consisting of the SBBs reporting to their Sales Manager who in turn reports up the chain of command. Per the SBB Requisition Description, "the SBB will *work closely* with the Banking Center, Customer Contact Center, Merchant, Business Banking partners and other leadership…"[5] Adding specificity to this notion, BofA's "One Team Integration" model tells SBBs to "work together" with the other "specialists" in order to create a "One Team Culture" having "One Team Principles" such as staying connected, coaching each other, sharing clients, strategically planning, providing feedback, and building "our team."[6] Third, contrary to Defendant's representation that the team meetings are the only requirement, there are multiple expectations and restrictions on the time SBBs are to work. For instance, the Job Descriptions and Requisition Descriptions state that SBBs "may be required to work weekends and/or extended hours."[7] In addition, the SBB Playbook sets forth specific requirements and expectations on a daily, weekly and monthly basis – going so far as to give the SBBs a highly structured "Day in the Life" schedule that goes into fine detail, literally by the hour, of the activities the SBBs are to be engage in.[8] If that was not enough, SBBs are required to enter into "commitments" with banking centers they cover in order to guarantee that they are at the banking center on specific days of the week for the entire day.[9] Fourth, the SBB position is subject to daily, personal supervision by their Sales Managers. Sales Managers use SalesForce and Odin to instantaneously monitor and track the primary sales activities of the SBBs.[10]

## B.   Defendant Ignores Plaintiffs' Theory of Liability

Having abandoned the administrative exemption, Defendant's only defense in this case is the outside sales exemption.[11] "A trial court, in determining whether the employee is an outside

---

[4]  Dkt. 58-1, Ex. 2, Amaral Depo., p. 64:23-66:9.
[5]  Dkt 58-1, Ex. 16, RCTG Requisition Description, p. 672.00001, emph. added.
[6]  Dkt. 58-1, Ex. 12, "Small Business One Team Integration," p. BANA 669.
[7]   Dkt. 58-1, Ex. 3, Job Description, p. BANA 265; Ex. 16, p. 672.00001, RCTG Requisition Description.
[8]   Dkt. 58-1, Ex. 5, SBB Playbook, p. BANA 1316.
[9]   Dkt. 58-1, Ex. 10, SBB P'ship Agreement, p. LOPEZ 820; Ex. 11, SBB P'ship Checklist, p. BANA 275.
[10]   Dkt. 58-1, Ex. 2, Depo. of Amaral, p. 32:7-37:21; Ex. 13, Salesforce excerpt.
[11] Defendant contends it has a "due process right" to confront every member of the class. Not correct. "No case, to our knowledge, holds that a defendant has a due process right to litigate an affirmative defense as to each individual class member." *Duran*, at 38.

salesperson, must…inquir[e] into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Ramirez v. Yosemite Water Co., Inc.,* 20 Cal.4th 785, 802 (1999).

Defendant repeatedly argues that the central question is whether "each putative class member satisfied the outside salesperson exemption…" This contention completely ignores Plaintiffs' theory of liability. Plaintiffs are not attempting to determine the percent of the class that has been misclassified or to put a specific exempt/non-exempt label on each member of the class. Plaintiffs' theory is that BofA has misclassified the job as a whole because the realistic expectation is that the SBB job is inherently an inside sales position.

Because Plaintiffs' theory of liability is that Defendant has structured, designed and managed the SBB position as an inside sales position, Plaintiffs' theory is an all-or-nothing proposition: either BofA classified the SBB position properly or it did not. The legal determination of whether the SBB position is properly classified as an outside sales position is equally applicable to all SBBs. Thus, the answer to that question is both a "common answer" and an answer that is "apt to drive the resolution of the litigation." *Wal-Mart Stores v. Dukes,* 564 U.S. 338, 350 (2011).

The "ultimate question is: what are 'the *realistic* requirements of the job?" *Duran v. U.S. Bank Nat. Assn.,* 59 Cal.4th 1, 52 (2014). "Once we have brought into focus the ultimate issue of 'the employer's realistic expectations' or 'the *realistic* requirements of the job' it is not difficult to contemplate that employees in a given job classification will often be either wholly exempt or wholly nonexempt, since a job classification often entails a common set of employer expectations or requirements for performance of the job." *Duran* at 53. Such is the case here.

Defendant's attempt to down-play the importance of assessing the employer's realistic expectations fails as it is, in fact, the "ultimate question." *Martinez v. Joe's Crab Shack Holdings,* 231 Cal.App.4th 362, 382 (2014) ("courts in overtime exemption cases must proceed through analysis of the employer's realistic expectations and classification of tasks rather than asking the employee to identify in retrospect whether, at a particular time, he or she was engaged in an exempt or nonexempt

1    task.") Defendant fails to address *Martinez* and instead attempts to re-write the law by drafting a

2    series of seemingly individualized inquires. Defendant's contention, bereft of legal support,

3    contradicts *Ramirez* and therefore should be disregarded.

4        **1.    The Predominant Common Question Here Is Objective and Binary**

5        Defendant's argument that the Court must look at how each SBB performed the job, or how

6    well it was performed, is incorrect. Unlike *Ramirez* or *Walsh v. IKON,* 148 Cal.App.4th 161 (2007),

7    there is no disagreement that the SBB job is primarily a sales job. Hence, the only relevant question is

8    <u>where</u> the job was performed which is a purely *objective* and binary proposition: either the job was an

9    inside sales job or an outside sales job. Unlike the situation here, in both *Ramirez* and *Walsh*, there

10   was no disagreement about <u>where</u> the employees performed the job – those employees were outside.

11   Thus, the question in those cases was the s*ubjective* characterization of <u>how</u> the job was performed,

12   i.e., were the employees primarily engaged in exempt sales activities or nonexempt

13   delivery/maintenance activities? As that is not the question presented to this Court, Defendant's

14   reliance on those cases is misplaced.

15       **2.    Defendant's Authorities Support Class Treatment Under The Facts Here**

16       Defendant cites to *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935 (9th Cir. 2009)*, In*

17   *re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009) (*Wells I*), and *In re*

18   *Wells Fargo Home Mortg. Overtime Pay Litigation*, 268 F.R.D. 604 (N.D. Cal. 2010) (*Wells II*) in

19   support of its contention that certification is improper here. In fact, all of these cases support

20   certification under the facts of this case.

21       In *Vinole,* the court noted that a focus on "whether the employer exercised some level of

22   centralized control in the form of standardized hierarchy, standardized corporate policies and

23   procedures governing employees, uniform training programs, and other factors susceptible to common

24   proof" could satisfy the predominance requirement. In *Wells I*, facing a "fact-intensive inquiry"

25   regarding application of outside sales exemption, the court noted, "A centralized policy requiring

26   employees to be at their desks for 80% of their workday would change this individual issue into a

27   common one."). In *Wells II*, the court held that predominance can be shown by "some form of

28   common proof, such as a standard policy governing how and where employees perform their jobs."

         Plaintiffs have submitted substantial common proof that SBBs perform the same activities and

1    those common activities dictate that the position be performed as an inside sales position. For

2    instance, Defendant does not contest that: (1) every task SBBs were required to perform could be

3    done inside a branch; (2) SBBs were required and incentivized to track their "face-to-face" meeting

4    and telephone calls through Salesforce and their Sales Managers used that reporting to track their

5    activities and review their performance; (3) SBBs were required and incentivized to record their

6    mileage for reimbursement; (4) SBBs were required to engage in telemarketing from their offices and

7    also used their office telephones to talk to customers, referral sources, supervisors, underwriting and

8    other Bank personnel; (5) SBBs needed their computers to access customer accounts, conduct internet

9    research, prepare documents, and respond to emails; (6) SBBs reviewed hard copy files of customers'

10   applications, financial statements and tax returns which were kept at the branch; (7) SBBs needed

11   access to copiers, scanners and fax machines; (8) SBBs obtained and used lead lists, printed, folded,

12   stuffed and mailed flyers from the branch; (9) SBBs set up customer appointments including closings

13   in the branch; (10) SBBs were required to participate in branch "huddles" and be physically present

14   for an entire day at each of the branches they covered; (11) SBBs were required to interact with their

15   "partners" in order to solicit more business and provide referrals; (12) SBBs sold, cross-sold, serviced

16   and referred walk-in customers to the branch; and, (13) SBBs were required to attend various

     meetings and complete training courses – all of which happened at BofA offices.

17          Under similar circumstances, other courts have likewise certified cases under the outside sales

18   exemption. In *Peterson v. Alaska Commc'ns Sys. Grp., Inc.*, 328 F.R.D. 255 (D. Alaska 2018),

19   plaintiffs alleged they were misclassified under the outside sales exemption.[12] The court distinguished

20   *Vinole* and *Wells I* because the plaintiffs were able to show uniform policies and practices including a

21   uniform job description, appraisal form, and sales process; close management and supervision and

22

23   ───────────────────────

     [12] *See also, Ambrosia v. Cogent Comm'ns*, 312 F.R.D. 544, 557 (N.D. Cal. 2016) (in **outside sales**
     exemption case, predominance satisfied where "all of the putative class members sell roughly the
24   same products, are recruited and hired using the same job description, and are paid under the same
     compensation plan," and employee testimony corroborated that the duties and tasks were similar);
25   *Martino v. Ecolab, Inc.*, 2016 WL 614477, at *5–6 (N.D. Cal. 2016) (in **outside sales** exemption
     case, predominance satisfied); *Troy v. Kehe Food Distributors, Inc.*, 276 F.R.D. 642, 657 (W.D.
26   Wash. 2011) (in **outside sales** exemption case, predominance satisfied where employees' "job duties
     and responsibilities are consistent and subject to centralized control," and common questions such as
27   "whether the [state law] exemption applies," among others, predominate over the "individualized
     questions of damages").

28

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION FOR CLASS CERTIFICATION
18-cv-02346-VC

1   uniform policy of requiring overtime work; job and duties of the employees closely following the

2   uniform sales process notwithstanding variance on mix; and, the percent of time outside of the office

3   had minimal variation and the employees "otherwise performed the same tasks and duties and were

4   subject to the same supervision, training, and guidance." *Peterson*, at 276. All of these facts – and

5   more – are present here.

6        **3.   Defendant Has No Relevant Evidence Showing Material Variation**

7        Defendant's argument that there is variation amongst the class rests on irrelevant differences.

8   For instance, it is irrelevant that SBBs spent different amounts of time inside (or outside) because

9   there are not degrees of "exempt-ness." See, 8 CCR § 11040(2)(M). "Neither variation in the mix of

10   actual work activities undertaken during the class period by individual [class members], nor

11   differences in the total unpaid overtime compensation owed each class member, bars class

12   certification as a matter of law." *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 335

13   (2004). In other words, it makes no difference if an SBB spent 50% of his or time inside or 100% - the

    SBB would still be non-exempt.

14        Defendant argues that "at least 17 SBBs reported they spent at least 50% or more of their time

15   outside of the bank's facilities." This statement is both misguided and false. As an initial matter,

16   predominance is a comparative concept, it does not mean uniformity. *Sav-On,* at 334 ("Predominance

17   is a comparative concept, and 'the necessity for class members to individually establish eligibility and

18   damages does not mean individual fact questions predominate."); *Kamar v. Radio Shack Corp.,* 254

19   F.R.D. 387, 399 (C.D. Cal. 2008) (granting certification citing *Sav-On*, "the existence of certain

20   individualized or deviating facts will not preclude certification if most class members were subjected

21   to a company policy in a way that gives rise to consistent liability or lack thereof"); *Local Joint Exec.*

22   *Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1163 (9th Cir. 2001)

23   (some variation in the class does not preclude certification); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731

24   F.3d 952, 963 (9th Cir. 2013) (Rule 23(b)(3) tests whether the class is "sufficiently cohesive").

25        Plaintiffs readily acknowledge that there is always some variation in any class. However, the

26   question is whether the level of variation is material. *Walsh*, at 1456, fn. 10 (lack of material

27   difference in work performed by class members would support certification). Here, the evidence

28   shows that there is no material variation amongst the class.

Moreover, Defendant has misrepresented Plaintiffs' evidence. There are in fact only 11 questionnaire responses out 75 SBB statements Plaintiffs have collected reporting spending more time outside than in.[13] Defendant is apparently counting the questionnaires of SBBs who reported spending 50% of their time inside including those who reported a range of 50-60% of their time inside. If an employee evenly divided his or her time between inside versus out, the employee would not qualify for the exemption because the employer must show that the employee is "primarily engaged" in the exempt work which is defined as "more than one-half of the employee's worktime." Labor Code § 515(a) and (e).[14]

Defendant's own declarations do not provide any meaningful variation. As an initial matter, Defendant has only been able to cobble together five nearly cookie-cutter declarations. This is noteworthy given that Defendant is the current employer to many SBBs and, as such, has unfettered access them. Given the inherently coercive nature of the relationship, the dearth of a quantitative and qualitative showing on Defendant's part highlights the weight that should be attributed to Defendant's evidence – none.

In terms of the testimony itself, a review does not show material variation: it shows just the opposite. Cabrera: length of meetings ranges between 45 minutes to 1 hour. (Cabrera Decl., ¶ 7.) Jewett: length of meetings ranges from 45 minutes to 1 hour. (Jewett Decl., ¶ 6.) Moon: length of meetings ranges from 30 minutes to 1.5 hours. (Moon Decl., ¶ 6.) Defendant's own testimony confirms Plaintiffs' allegations that the experiences of the class members have been substantially uniform.

Moreover, the declarations are vague and ambiguous as to phrase "outside in my territory."

---

[13] Defendant incorrectly refers the questionnaires as "surveys." Plaintiffs did not administer a survey nor are they offering the questionnaire responses as survey responses or employing any statistical analysis to the responses. Thus, Defendant's reliance on *Dukes, Vinole, Duran* and *Trahan* is misplaced.

[14] Defendant also misreads *Ramirez* by arguing that preparation time counts toward the exemption. This is incorrect. The question in *Ramirez* was between sales and non-sales activity; not inside and outside. Here, there is no disagreement that all the activities SBBs do, regardless of location, are sales or sales related. The difference between the parties lies, however, in where the SBBs are doing their job. Defendant's would impute a result that would lead to an absurdity. Under Defendant's construction, an employee who spends most of his or her time inside, but is nevertheless engaged in sales related activities, could be classified as exempt. This construction reverses the burden of proof and "confound[s] federal and state labor law, [] thereby providing less protection to state employees..." *Ramirez*, at 798.

Evid. Code §§ 403, 611. In nearly identical paragraphs, Defendant's declarants appear to contend that they spent most of their time outside. However, it is unclear from the declarations whether these SBBs have included time at the other branches they cover, including travel time, as "outside in my territory." Because all of these declarants attest to covering between 3-5 branches, there is no way to know whether Defendant's representation that they spend more time out than in is accurate as any time an SBB is at one of Defendant's branches, including the drive time to the branch, would not count toward the exemption. *Ramirez*, at 801 (legal classification of work at destination, i.e., exempt or non-exempt, determines apportionment of drive time).

Defendant's authorities are legally inapposite and factually distinguishable because they all exhibit a level of variation not present here. In *Rosenberg v. Renal Advantage, Inc.*, 2013 WL 3205426 (S.D. Cal. June 24, 2013), a case where plaintiffs alleged they were misclassified under the professional exemption, plaintiffs' motion was based on a job description and "a few generalized sworn statements." *Id.* at *8. The court denied certification stating, "the varied evidence…is significant" based on "different job duties across the Care Clinics, and each RD carries out their job differently depending on their own experience, the needs of the Care Center, and the needs of the patient." *Id*. at *6-7. *Fjeld v. Penske Logistics, LLC*, 2013 WL 8360535 (C.D. Cal. Aug. 9, 2013) is similarly inapposite. In *Fjeld*, the plaintiff alleged he was misclassified under the administrative exemption. The court determined that under that exemption, also not at issue here, it needed to know not only what tasks the employees were performing but how they were doing them. *Id*. at *4. The plaintiff in *Fjeld* had even less evidence than in *Rosenberg*. He only offered evidence on how he performed his job. *Id*. at *5. Based on plaintiff's lack of evidence and the evidence from defendant showing dissimilarities amongst the class as viewed through the prism of the multipart exemption at issue there, the court had no difficulty denying class certification. *Ibid. See also*, *Vinole*, 571 F.3d at 938 ("time in or out of the office varies greatly"); *Wells I*, 571 F.3d at 957 ("serious issues regarding individual variations"); *Wells II*, 268 F.R.D. at 608 (same); *Soderstedt v. CBIZ*, 197 Cal.App.4th 133, 154 (2011) (implementation of policies "varied depending on multiple factors.")

### 4.    Credibility Determinations Do Not Preclude Certification

Defendant makes the unremarkable observation that credibility determinations will need to be made. One is hard pressed to imagine a case that does not contain some form of credibility

determination. Indeed, such a result is illogical at it would preclude all class actions. This very argument was rejected in *Sav-On*: "[Q]uestions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses ... and the determination of [any] conflicts and inconsistency in their testimony are matters for the trial court to resolve." *Sav-On*, at 334.

## C.      The Class Representatives are Typical and Adequate

Defendant has pointed to no evidence demonstrating that Plaintiffs' interests are antagonistic to the class. Defendant does not contest that Plaintiffs' claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members and are based on the same legal theory as their claims. Hence, typicality is satisfied. *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 649 (C.D. Cal. 1996).

Rather than address the actual test for typicality, Defendant argues merits. Defendant states that the named plaintiffs failed to meet Defendant's expectations including their face-to-face meetings. This argument confuses concepts. Defendant equates meeting sales quotas with meeting expectations under *Ramirez*. While meeting sales quotas is one of the expectations Defendant had for its SBBs, it has no legal significance. In *Ramirez*, a distinction was drawn between *types* of activities – exempt sales versus nonexempt deliveries. *Ramirez,* at 802. This analysis only has application when there is a disagreement about the *type* of work that is being performed. Here, there is no disagreement as to the *type* of work the Plaintiffs were engaged in. They, like all other SBBs, were engaged in sales. The fact that some SBBs may be more successful at closing sales than others does not mean they are any less engaged in sales. Thus, even the "poor performers" are meeting BofA's realistic expectations because they are primarily engaged in sales activities.

Moreover, in terms of the number of face-to-face meetings the Plaintiffs had, the uncontested evidence shows that Lopez and Willis maintained an average that is substantially similar to that of other SBBs. (Dkt. 58-22, Suppl. Decl. of Steward, ¶¶ 5-6, Plaintiffs averaged 5.13 and 5.73 meetings per week and class averaged 7.14.) Moreover, even assuming *arguendo* that the amount of meetings the Plaintiffs conducted was somehow atypical of other SBBs (it's not), such a conclusion is irrelevant because Defendant did not care where the meetings took place – it only cared that they took place.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      This Class Action Is Manageable and a Superior Method of Adjudication**

Defendant does not contest that the factors enumerated under Rule 23(b)(3)(D) are satisfied here. Instead, Defendant makes two arguments that are easily dispatched. First, Defendant argues that a trial will devolve into a series of mini-trials. This conclusory argument assumes its faulty premise that a liability determination will need to be made SBB-by-SBB. This is not Plaintiffs' theory of liability. Plaintiffs are putting the SBB job on trial and the trier of fact will determine whether Defendant's expectations are realistic or not. Defendant does not dispute that its expectations are common to the class. Thus, the finding will be equally applicable to the entire class and, as Defendant admits, supports a finding of manageability.

Second, Defendant argues that differences in damages precludes certification. This contention is simply meritless. *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 513-514 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification.") Defendant cites *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) in support of its contention but *Comcast* dealt with a situation not present here. In *Comcast*, the Supreme Court reversed an order granting class certification because the damages model was not tied to the theory of liability. *Id.* at 1433. Here, however, the theory is misclassification and the damages model is the unpaid overtime wages. Defendant does not seriously contend that overtime wages are not tied to the misclassification claim. Instead, Defendant argues, without explanation, that the damages inquiries are "highly individualized." This argument lacks any persuasive value where, as here, the employer is in possession of much of the data to calculate damages. *Levya*, 716 F.3d at 515 (reversing denial of certification on manageability grounds stating "[defendant's] own documents demonstrate the feasibility of calculating damages in this case.") The Ninth Circuit also cited to the defendant's removal papers as evidence that calculating damages is not the daunting task defendant has sought to portray. *Id.* The same is true here. See, e.g., Dkt. 12-1, Decl. of Bush in Opo. to Motion to Remand (case 3:17-cv-02383-VC); Dkt 1, Notice of Removal (case 3:18-cv-02346-JSC).

Rather than supporting denial, Defendant's other cases support class certification. Defendant quotes *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001) yet noticeably omits the full quote which reads: "The district court thus concluded that there was no manageable trial plan adequate to deal with individualized issues *and variances in state law*." *Id.*, emph. added. In

*Zinser*, plaintiff sought to certify a nationwide products liability/mass tort class that involved differing laws from every state. *Id.* at 1189 (observing that merely instructing the jury alone would be "impossible"). Additionally, the case was a products liability case which the court noted is "inherently" difficult to certify. *Id.* at 1186. Defendant's reliance on *In re Paxil Litigation,* 212 F.R.D. 539 (C.D.Cal.2003) is similarly misplaced as that case was another products liability/mass tort case involving the laws of multiple states. *Id.* at 542. Perhaps contrary to what Defendant intended, *Zinser* and *In re Paxil* show what an unmanageable case looks like. Neither bear any resemblance to the case at bar.

### III.    CONCLUSION

In light of the foregoing, Plaintiffs request that certification be granted.


DATED:  June 12, 2019                                    WYNNE LAW FIRM


                                                         /s/ Edward J. Wynne
                                                         By: Edward J. Wynne
                                                         Attorney for Plaintiffs